[No. 60583-1. En Banc. May 26, 1994.]

THE STATE OF WASHINGTON, *Respondent*, v. ANTWON LANELL JOHNSON, *Petitioner*.

*Antwon Johnson,* pro se, and *Andrew P. Stanton of Washington Appellate Defender Association,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Denis A. O'Leary* and *Theresa Fricke, Senior Prosecuting Attorneys,* for respondent.

SMITH, J. — Petitioner Antwon Lanell Johnson seeks review of a decision of the Court of Appeals, Division One, affirming the aggravated exceptional sentence imposed upon him by the King County Superior Court following his conviction of one count of assault in the first degree and one count of assault in the second degree.[1] We affirm.

## STATEMENT OF FACTS

On March 13, 1990, Petitioner Antwon Lanell Johnson fired from a handgun several shots at two automobiles driven by Marvin Jones and Taifa Griffith, members of a group called the "Crips", reported to be a rival "gang" to the "Black Gangster Disciples", another "gang" commonly known as "BGD". He fired at another automobile driven by Germaine Scott. The incident occurred in front of John Muir

---

[1]*State v. Johnson,* 69 Wn. App. 528, 849 P.2d 662 (1993).

Elementary School in Seattle while school was in session.[2]
On March 16, 1990, the King County Prosecuting Attorney
filed an information charging Petitioner Johnson with two
counts of assault in the first degree, both with deadly
weapon allegations.[3]

The case proceeded to trial upon a second amended infor-
mation in the King County Superior Court before a jury in
the courtroom of the Honorable Frank J. Eberharter, judge
pro tempore, on June 1 and 4, 1990.

Pertinent portions of the second amended information
read:

### COUNT I

[Accusing] Antwon Lanell Johnson of the crime of assault in
the first degree, committed as follows:

That the defendant Antwon Lanell Johnson, in King County,
Washington, on or about March 13, 1990 with intent to inflict
great bodily harm, did assault Marvin Jones with a firearm and
a deadly weapon and force and means likely to produce death,
to-wit: handgun;

Contrary to RCW 9A.36.011(1)(a), and against the peace and
dignity of the State of Washington.

### COUNT II

[Accusing] Antwon Lanell Johnson of the crime of assault in
the first degree, a crime based on the same conduct as another
crime charged herein, which crimes were so closely connected
in respect to time, place and occasion that it would be difficult
to separate proof of one charge from proof of the other, commit-
ted as follows:

That the defendant Antwon Lanell Johnson, in King County,
Washington, on or about March 13, 1990 with intent to inflict
great bodily harm, did assault Taifa Griffith with a firearm and
a deadly weapon and force and means likely to produce death,
to-wit: a handgun;

Contrary to RCW 9A.36.011(1)(a), and against the peace and
dignity of the State of Washington.

The information in both counts indicated that assault in
the first degree as charged included the lesser offense of as-
sault in the second degree. It further accused Antwon
Lanell Johnson "at said time of being armed with a deadly

---

[2]Clerk's Papers, at 3-4.

[3]Clerk's Papers, at 1-2, 9-11. The information was amended on June 4, 1990, to
eliminate reference to "a .380 semi-automatic" handgun. Clerk's Papers, at 30-31.

weapon, to-wit; a handgun, under the authority of RCW 9.94A.125."

At trial several eyewitnesses testified that Petitioner Johnson had fired at the automobiles and fled from the scene. These witnesses included William Robbins, a parent picking up his child from school at the time of the shooting; Roy Dunn, a crossing guard who observed the shooting and collected from the street several spent cartridges following the shooting; Germaine Scott, a member of the "Crips" and driver of a third automobile which escaped from the shooting; and Marvin Jones.[4]

Marvin Jones testified that he and Taifa Griffith were members of the "Crips" gang; that they were on "Black Gangster Disciples" (BGD) "turf" on Horton Street near John Muir Elementary School talking to some girls; that four members of the BGD "gang" (Petitioner Johnson was not in the group) saw them and everyone "flashed" their respective "gang signs"; that one of the BGDs ran away from the group; that he and two other "Crips" got into their automobiles to follow the BGD because they believed he had gone to get a gun; that Petitioner Johnson jumped from some bushes and fired at two of the three automobiles driven by the "Crips" in front of John Muir Elementary School; and that all the "Crips" fled from the scene in their automobiles.[5] Germaine Scott testified that during the shooting he observed Petitioner Johnson near the BGD who had earlier run away from the group.[6]

During closing argument by the State, there was a loud outburst in the courtroom by an unidentified woman in the audience. Petitioner referred to her several times in the

---

[4]Verbatim Report of Proceedings (June 1, 1990), at 16-20, 32-39; Verbatim Report of Proceedings (June 4, 1990), at 12-15, 39-42.

[5]Verbatim Report of Proceedings (June 4, 1990), at 3-22. This testimony was corroborated by the testimony of Germaine Scott on the same day. The testimony of the parent, William Robbins, and the school crossing guard, Roy Dunn, also corroborated Marvin Jones' testimony. See Verbatim Report of Proceedings (June 1, 1990).

[6]Verbatim Report of Proceedings (June 4, 1990), at 37-39.

jury's presence as "mom". In part, the woman exclaimed "it ain't fair! This is not fair. They are just a bunch of gang-bangers!" She then declared "[a]ll I want you jurors to know is that Martin, their [sic] Cripps [sic]. Their [sic] crabs. Their [sic] gang bangers. My son ain't no gang banger, honey . . .".[7] The woman was removed from the courtroom. Defense counsel moved for a mistrial. The court denied the motion and instructed the jury "not to consider anything that was stated by the person who was sitting in the bench in the rear of the courtroom, as it has absolutely nothing to do with the charges made against the defendant here or of any verdict you may arrive at."[8]

On June 5, 1990, the jury found Petitioner Johnson "guilty" of one count of assault in the first degree and one count of the lesser included offense of assault in the second degree. The jury also found on both counts that Petitioner was armed with a deadly weapon.[9]

At the sentencing hearing on August 13, 1990, Seattle Police Officer Dale Williams related a prior encounter with Petitioner Johnson. He testified that on July 20, 1989 (approximately 9 months prior to the shooting in this case) he arrested two members of the "Crips" gang who were chasing Petitioner Johnson; that Petitioner had not committed any offense and was not arrested; that at the scene of the arrest Petitioner "flashed" what are characterized as "gang signs" at the "Crips", acted in a boastful manner, and told the two "Crips" they should not enter BGD "turf" in the future; and that later Petitioner told him in a proud manner that he was a member of the BGDs.[10]

Detective Paul Pomerville, a member of the Seattle Police Gang Task Force and an "expert on street gangs", testified

---

[7]The text of those statements is contained only in the correspondence file as a "Supplemental Verbatim Report of Proceedings".

[8]Verbatim Report of Proceedings (June 4, 1990), at 67-69.

[9]Clerk's Papers, at 54-57.

[10]Verbatim Report of Proceedings (Aug. 13, 1990), at 6-12.

at the sentencing proceeding.[11] He stated that in general a "street gang" is a subcultural group with distinct beliefs, values, behavior, art, dress, and written, verbal and non-verbal forms of communication; that the most important value is image or reputation; that reputation is gained by perpetrating acts of violence upon police and rival gangs or through suffering violence during initiation into a gang; and that status and leadership within the group is achieved by committing acts of violence. He also stated that criminal conduct is an integral part of street gang activity; and that its primary focus is to control a geographical area or "turf" where the group can exercise a monopoly control over drug traffic. He also mentioned that one theory explaining the reason for gang membership is breakdown of the family and that the gang becomes a surrogate family providing structure and values.[12] He also testified that he was familiar with Seattle street gangs and that there had been recent violence among them over "turf".[13]

On September 7, 1990, Judge Eberharter signed a judgment and sentence. Petitioner Johnson had an offender score of 3. After determining that "[s]ubstantial and compelling reasons exist which justify a sentence above/below [sic] the Standard range for Count(s) I & II", the court imposed upon Petitioner an exceptional sentence of 170 months' incarceration for assault in the first degree, to run concurrently with an exceptional sentence of 50 months' incarceration for assault in the second degree.[14] The court also entered findings of fact and conclusions of law as follows:

---

[11]See Verbatim Report of Proceedings (Aug. 13, 1990), at 14-15. Presumably he qualified under ER 702 as "a witness qualified as an expert by knowledge, skill, experience, training, or education" to "testify . . . in the form of an opinion or otherwise." His qualifications were not challenged. He has been a Seattle police officer for 15 years; was assigned to the gang task force for 2 years; holds an M.A. degree in cross-cultural communication and a Ph.D. degree in intercultural studies. Both his graduate degrees relate to analysis and interpretation of cultures.

[12]See Verbatim Report of Proceedings (Aug. 13, 1990), at 16-19, 24-25.

[13]See Verbatim Report of Proceedings (Aug. 13, 1990), at 20.

[14]Clerk's Papers, at 66-70. The trial court determined that, under the Sentencing Reform Act of 1981 with an offender score of 3 and a deadly weapon finding,

## FINDINGS OF FACT

1. Antwon Johnson is a known member of the Black Gangster Disciples (BGD's) street gang. His membership with this gang predated the assaults.
2. The named victims were members of the CRIPS street gang. The CRIPS and BGD's are rival organizations.
3. The purposes of these gangs are narcotics trafficking and the commission of violent offenses.
4. The BGD's are structured with a hierarchy among its members. A member elevates his position in this hierarchy and enhances his status by committing violent acts against rival gang members.
5. Antwon Johnson committed these assaults against rival gang members in an attempt to assert BGD dominance over the CRIPS and to advance his own position within the BGD organization.
6. The impact of the defendant's assaults went far beyond the intended victims.
7. The defendant opened fire on gang members immediately next to a public elementary school that was in session.
8. As a result of the defendant's actions, children have become frightened to go to school and parents fearful that their children are not safe while at the school.
9. The defendant invaded the community's zone of safety.

## CONCLUSIONS OF LAW

1. Jurisdiction is properly before this court.
2. These crimes were gang-motivated. The court finds this to be an aggravating factor which justifies going beyond the presumptive standard range.
3. The invasion of the community's zone of safety is an aggravating factor which justifies going beyond the presumptive standard range.
4. As to Count I, the defendant is sentenced to 170 months. As to Count II, he is sentenced to 50 months. Count I & II are to run concurrently.[15]

On October 4, 1990, Petitioner Johnson filed a Notice of Appeal to the Court of Appeals, Division One, claiming the trial court erred in imposing an exceptional sentence because of "gang motivation". On April 26, 1993, the Court

assault in the first degree (RCW 9A.36.011) has a seriousness level of XI and a standard range of 85 to 113 months, with a maximum of life; and assault in the second degree (RCW 9A.36.021) has a seriousness level of IV and a standard range of 25 to 29 months, with a maximum of 10 years.

[15]Clerk's Papers, at 71-73.

of Appeals, the Honorable Jack P. Scholfield writing, issued its decision affirming the judgment and sentence.[16]

On June 14, 1993, Petitioner filed in this court a Petition for Discretionary Review of the decision of the Court of Appeals. He claims, among other things, that the sentencing court and the Court of Appeals erred in concluding there was "gang motivation" for the shooting justifying imposition of an exceptional sentence above the standard range. He claims it is "constitutionally impermissible" to punish him "solely based upon his association with" the BGD gang.[17] Petitioner also filed a pro se brief in which he claims the trial court permitted other violations of his constitutional rights. This court granted review on October 6, 1993.

## QUESTIONS PRESENTED

The questions presented in this case are whether the Court of Appeals erred in affirming the trial court in imposition of an aggravated exceptional sentence under the Sentencing Reform Act of 1981[18] based upon "gang motivation" incident to a shooting in the area of an elementary school and upon community impact of the shootings (violation of the "community's zone of safety"); and in denial of a motion for mistrial after a courtroom disturbance in the presence of the jury caused by a verbal outburst from a woman in the audience during the trial.

## DISCUSSION

■ Review of an exceptional sentence is governed by RCW 9.94A.210(4). An appellate court analyzes the appropriateness of an exceptional sentence by determining (1) whether the reasons given for it are supported by the evidence in the record under a "clearly erroneous" standard of review; (2) whether the reasons given for the exceptional sentence justify departure from the standard range as a "matter of law"; and (3) whether the exceptional sentence is clearly too exces-

---

[16]State v. Johnson, supra.

[17]Pet. for Review, at 11, 13.

[18]RCW 9.94A.

sive or too lenient under an "abuse of discretion" standard of review.[19]

RCW 9.94A.390(2) lists several aggravating factors the trial court may consider in imposing an exceptional sentence. They are not exclusive and are illustrative only.[20] None of the factors listed seem to apply in this case. The justification given by the trial court must then be tested against reasons not specified in the illustrations, but allowable under RCW 9.94A.210(4) and (5), which provide:

> (4) To reverse a sentence which is outside the sentence range, the reviewing court must find: (a) Either that the reasons supplied by the sentencing judge are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard range for that offense; or (b) that the sentence imposed was clearly excessive or clearly too lenient.
>
> (5) A review under this section shall be made solely upon the record that was before the sentencing court. . . .

Petitioner Johnson challenges only the sentencing court's use of "gang motivation" and "community impact" as justification for the exceptional sentence. He does not claim the exceptional sentence is clearly excessive.[21]

 This court must scrupulously avoid accepting without evidence that an accused person is a participant in a group which constitutes a street "gang" and that the "gang" is involved in criminal activity. We must then have a fair definition of "gang" and must determine that criminal activity by individuals or groups constituting a gang is clearly established by competent evidence upon the record. We adopt the *Black's Law Dictionary* definition of "gang" as "[a]ny company of persons who go about together or act in concert; in modern use, mainly for criminal purposes."[22]

---

[19]*State v. Allert*, 117 Wn.2d 156, 163, 815 P.2d 752 (1991); *State v. Holt*, 63 Wn. App. 226, 228-29, 817 P.2d 425 (1991).

[20]*See* RCW 9.94A.390; *State v. Estrella*, 115 Wn.2d 350, 357, 798 P.2d 289 (1990).

[21]*See State v. Cuevas-Diaz*, 61 Wn. App. 902, 905, 812 P.2d 883 (1991).

[22]*Black's Law Dictionary* 679 (6th ed. 1990). *See also The Random House Dictionary of the English Language* 786 (2d ed. 1987); *Webster's Third New International Dictionary* 934 (1971); *The Oxford English Dictionary* vol. IV, at 43-44 (1961).

Gang Motivation as Basis for Exceptional Sentence

■ Petitioner claims an aggravated exceptional sentence was imposed upon him solely because of his association with or membership in the BGD street gang. If that evidence were not relevant to the issues at trial and at sentencing, the punishment would then constitute a violation of the First Amendment right of freedom of association as declared by the United States Supreme Court in *Dawson v. Delaware.*[23] However, the evidence is relevant to the issues in this case.

In *Dawson,* the defendant was sentenced to death, upon a jury verdict, for aggravated murder committed after his escape from a Delaware prison. At sentencing evidence was admitted that he was a member of the Aryan Brotherhood prison gang. The United States Supreme Court concluded:

> The Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment.[24]

Under *Dawson,* then, in general, and as a "matter of law", relevant evidence of a person's beliefs and associations is admissible at a sentencing hearing without amounting to a constitutional violation. Thus, in this case, the trial court did not err in considering Petitioner Johnson's association with a "gang" in determining applicability of an aggravated exceptional sentence.

The Court in *Dawson* observed that the "narrowness of the stipulation" made prior to the sentencing hearing allowed only a general statement concerning the nature of the Aryan Brotherhood prison gang. The stipulation provided:

> [T]he Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves

[23]503 U.S. 159, 117 L. Ed. 2d 309, 112 S. Ct. 1093 (1992).

[24]*Dawson,* 112 S. Ct. at 1094.

the Aryan Brotherhood now exist in many state prisons including Delaware.[25]

The Court noted that the State by stipulation agreed to present no other evidence concerning the Aryan Brotherhood or the chapter in which the defendant held membership. It noted that no evidence was presented to connect general Aryan Brotherhood beliefs with the defendant's motivation for committing the aggravated murder of a woman after his escape from prison.[26] The Court thus concluded that evidence of beliefs and associations of the defendant was irrelevant to his commission of the murder, and remanded to the Supreme Court of Delaware for its consideration whether the error was harmless under Delaware law.[27]

In this case, Detective Pomerville testified at sentencing as an "expert" on "street gangs". He stated that in general the primary activity of a "street gang" is commission of crime and that status and leadership in the group is achieved by committing acts of violence against rival gangs and police. He also stated that the primary focus of a street gang is to control a geographical area "turf" where the group can exercise monopoly control over drug traffic.[28] This kind of determinative definition has been challenged by several scholars.[29] However, at least two states with pronounced "criminal gang activity" have legislatively adopted similar definitions and mandatory enhanced sentences for "criminal

---

[25]Dawson, 503 U.S. at 162.

[26]Dawson, 503 U.S. at 166.

[27]Dawson, 503 U.S. at 168-69.

[28]See Verbatim Report of Proceedings (Aug. 13, 1990), at 16-19, 24-25.

[29]See Frank E. Harper, To Kill the Messenger: The Deflection of Responsibility Through Scapegoating (A Socio-Legal Analysis of Parental Responsibility Laws and the Urban Gang Family), 8 Harv. Blackletter J. 41 (1991); Margaret M. Russell, Entering Great America: Reflections on Race and the Convergence of Progressive Legal Theory and Practice, 43 Hastings L.J. 749 (1992); Alexander A. Molina, Comment, California's Anti-Gang Street Terrorism Enforcement and Prevention Act: One Step Forward, Two Steps Back?, 22 Sw. U. L. Rev. 457 (1993); Susan L. Burrell, Gang Evidence: Issues for Criminal Defense, 30 Santa Clara L. Rev. 739 (1990).

gang activity".[30] These statutes have been criticized as well.[31] The Washington Legislature has not enacted any statute defining "street gang" and no Washington statute specifically addresses "street gang activities".

Detective Pomerville also testified he was familiar with Seattle street gangs and that there had been recent violence among them over "turf".[32] Under *Dawson,* such expert testimony, without more, would not be relevant to commission of an offense even when the defendant acknowledges gang membership. However, it does become relevant when connected to the defendant's motivation for committing a crime.

In this case, the evidence established that Petitioner Johnson's association with the BGD gang was also his motivation for shooting at members of a rival gang. There was evidence at trial establishing that he was associated with the BGD, and that the victims were members of the "Crips", a rival gang. Evidence at the sentencing hearing established that Petitioner Johnson had taken an active role in protecting BGD "turf" from invasion by "Crips" members about 9 months prior to the shooting in this case. He was responsible for the arrest of two "Crips" members, had "flashed" gang signs at them during the arrest and warned them to stay off BGD "turf"; and had later boasted to the arresting officer that he was a member of the BGDs.

---

[30]*See* Texas Penal Code Ann. § 71.01, providing in part: "(d) Three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." Section 71.02(a) defines criminal activities as collaboration in drug, gun, sex, or gambling crimes, and including other felonies. *See also* Cal. Penal Code § 186.22 "Street Terrorism Enforcement and Prevention Act" (STEP); part (b)(1) provides for mandatory enhanced sentences for "gang" crimes; parts (e) and (f) provide a definition of gang and classify certain crimes as "gang activity". *But see People v. Green,* 227 Cal. App. 3d 692, 700, 278 Cal. Rptr. 140, 146 (1991) (holding that "active participation in a criminal street gang means that there is a relationship between the defendant and the gang that is more than nominal, passive, inactive, or purely technical", and that "defendant must devote all or a substantial part of his time and efforts to the gang".).

[31]*See* Molina, *supra*; Burrell, *supra.*

[32]See Verbatim Report of Proceedings (Aug. 13, 1990), at 20.

There was also evidence at trial that the March 13, 1990 shooting occurred immediately after several BGD members observed several "Crips" members on BGD "turf", that they had all "flashed" gang signs, and that one of them had run away and shortly reappeared with Petitioner Johnson, who carried a handgun. The weight of the evidence supports the conclusion reached by the trial court and affirmed by the Court of Appeals that the shooting was "gang motivated". The conclusion of the trial court was not "clearly errone- ous".

Petitioner also claims that findings of fact 4 and 5 are not supported by the evidence. He is not correct. The trial court found:

■ The BGD's are structured with a hierarchy among its members. A member elevates his position in this hierar- chy and enhances his status by committing violent acts against rival gang members.

■ Antwon Johnson committed these assaults against rival gang members in an attempt to assert BGD dominance over the CRIPS and to advance his own position within the BGD organization.

Detective Pomerville testified at sentencing that gangs generally seek to enhance their ability to maintain "turf" and a drug trafficking monopoly within that "turf" by com- mitting acts of violence against members of rival gangs who invade that "turf". He also testified that domination within a gang is achieved by committing acts of violence upon members of rival gangs. There was also testimony at sen- tencing by Officer Williams that Petitioner Johnson had previously taken an active role in protecting BGD "turf" from invasion by "Crips".

This evidence is sufficient to find acts of violence by Petitioner Johnson, a member of one gang, the BGDs, against members of a rival gang, the "Crips", which would tend to enhance the image and reputation of the BGDs. This is the essence of findings of fact 4 and 5. The conclusion by the trial court that the shooting was "gang motivated" is supported by the evidence and is not "clearly erroneous".

### Gang Activities and the "Real Facts" Doctrine

Petitioner also claims the sentencing court violated the "real facts" doctrine[33] in making finding of fact 5. He claims that if the finding were true, the State should have charged him with violating RCW 9A.82.060(1)(a) and (b), leading organized crime, or RCW 9A.28.040, criminal conspiracy. This is a specious assertion which is without merit.

RCW 9A.82.060 provides in relevant part:

(1) A person commits the offense of leading organized crime by:

(a) Intentionally organizing, managing, directing, supervising, or financing any three or more persons with the intent to engage in a pattern of criminal profiteering activity; or

(b) Intentionally inciting or inducing others to engage in violence or intimidation with the intent to further or promote the accomplishment of a pattern of criminal profiteering activity.

Petitioner ignores the legislative specification of the crime ("leading organized crime") stated in subsection (1). It is clear that the statute is intended to apply to persons who "lead" organized crime, rather than to all persons in a group who commit crimes. There was no evidence that Petitioner was a "leader" in the BGDs. Neither subsection (a) nor (b) applies to him. Also, there was no evidence that Petitioner was organizing, managing, directing, supervising, or financing anyone with the intent to engage in a pattern of profiteering activity. Subsection (1)(a) of the statute clearly does not apply to him.

Petitioner Johnson claims that "gang motivation" for any crime necessarily includes subsection (1)(b) of the statute. He cites finding of fact 3 which reads:

The purposes of [the BGD and "Crips"] gangs are narcotics trafficking and the commission of violent offenses.

Petitioner argues that commission of any act of violence against any member of a rival gang necessarily incites

---

[33]The "real facts" concept of RCW 9.94A.370(2) excludes consideration of either uncharged crimes or crimes charged but later dismissed. *See State v. Barnes*, 117 Wn.2d 701, 707, 818 P.2d 1088 (1991).

others to commit acts of violence in retaliation. He concludes that the resulting violence is gang activity, which includes criminal profiteering. Therefore, he claims, gang activity should be charged as criminal conspiracy or as leading organized crime. He ignores the plain language of subsection (1)(b) of RCW 9A.82.060. It requires that the person who incites others to commit violence must also intend to profit by its commission and must also intend that those acts of violence be directed at persons with opposing interests.

Petitioner's actions in this case do not constitute the crime of leading organized crime under subsection (1)(b) of the statute. Although his act of violence may have in some manner benefited the entire BGD gang,[34] Petitioner committed the act as an individual. There is no evidence that he incited or induced any other member of the BGDs to commit acts of violence.

Criminal conspiracy is governed by RCW 9A.28.040, which provides in relevant part:

> (1) A person is guilty of criminal conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them takes a substantial step in pursuance of such agreement.
>
> . . . .

There is absolutely no evidence in the record, by admission or otherwise, that Petitioner Johnson agreed with one or more persons to commit the assaults for which he was prosecuted. Thus there was no basis for charging him with criminal conspiracy.

The State properly did not charge Petitioner with leading organized crime under RCW 9A.82.060(1)(a) or (b), and properly did not charge him with criminal conspiracy under RCW 9A.28.040. We therefore conclude that the sentence in this case does not violate the "real facts" doctrine.

---

[34]This statement necessarily follows from finding of fact 5 which provides in part: "Antwon Johnson committed these assaults against rival gang members in an attempt to assert BGD dominance over the CRIPS . . .."

## Community Impact as Basis
## (for Exceptional Sentence)

Petitioner claims the sentencing court erred in basing his aggravated exceptional sentence upon the community impact of his crimes. The trial court found:

. . . .

6. The impact of the defendant's assaults went far beyond the intended victims.
7. The defendant opened fire on gang members immediately next to a public elementary school that was in session.
8. As a result of the defendant's actions, children have become frightened to go to school and parents fearful that their children are not safe while at the school.
9. The defendant invaded the community's zone of safety.

Petitioner cites *State v. Cuevas-Diaz*[35] for the proposition that impact of a crime on the community at large is not a sufficient basis for an aggravated exceptional sentence. The court in that case stated:

The trial court also relied on the impact of the offense on the victim and the community at large as a reason for the exceptional sentence. In our opinion, neither impact provides a basis for an exceptional sentence. We recognize that the crime victim as well as the community suffer from criminal acts; however, such impact is foreseeable and it exists in any case.[36]

That language would upon first reading seem to eliminate community impact as a basis for an exceptional sentence in any case. However, as the Court of Appeals pointed out in this case, "[t]here is no indication from the *Cuevas-Diaz* opinion as to what evidence, if any, the sentencing court had before it demonstrating actual community impact or fear."[37] In this case, there was evidence of fear in the children and their parents at the John Muir Elementary School because the shooting occurred in front of the school while classes were in session and close to release time for the day. Petitioner lived across the street from the school and foreseeably should have known that school was in ses-

[35]61 Wn. App. 902, 905, 812 P.2d 883 (1991).

[36]*Cuevas-Diaz*, at 905.

[37]*Johnson*, at 540.

sion.[38] The Court of Appeals concluded that "the evidence of distinctive community impact is simply more compelling here than in *Cuevas-Diaz.*"[39]

This court has not previously addressed the issue of community impact of a crime as a basis for imposing an aggravated exceptional sentence. However, it has upheld as constitutional statutes imposing mandatory enhanced sentences for drug offenses committed in specified proximity to schools and school bus stops.[40] The reasoning of the Court of Appeals in this case is consistent with our approval of statutory sanctions designed to protect school children from drug trafficking. There is no direct statutory basis for an enhanced penalty in this case except as may be justified under the Sentencing Reform Act of 1981.[41]

The court in *Cuevas-Diaz* affirmed an exceptional sentence for different, but similar, reasons. It stated that "the trial judge's findings relating to the impact of the defendant's activities on others, *i.e.,* the children of the assault victim"[42] provided justification for the exceptional sentence under *State v. Barnes*[43] and *State v. Crutchfield.*[44]

The Court of Appeals in *Cuevas-Diaz* stated:

> To provide support for an exceptional sentence, the defendant's actions must have had an impact on . . . "other persons" of a

[38]In addition to testimony from William Robbins (a parent), the sentencing court was presented with letters from the Mount Baker community near John Muir Elementary School expressing fear and anxiety caused by the shooting. See Verbatim Report of Proceedings (Aug. 2, 1990), at 3.

[39]*Johnson,* at 540.

[40]*See State v. Coria,* 120 Wn.2d 156, 839 P.2d 890 (1992); *see also State v. Dobbins,* 67 Wn. App. 15, 834 P.2d 646 (1992), *review denied,* 120 Wn.2d 1028 (1993); *State v. Lua,* 62 Wn. App. 34, 813 P.2d 588, *review denied,* 117 Wn.2d 1025 (1991). For a legislative extension of this concept to gang activity, see Cal. Penal Code § 186.22(b)(1) which provides for mandatory enhanced sentences of 2, 3 and 4 years for "gang" crimes committed within 1,000 feet of a school during hours when students or faculty might be present.

[41]RCW 9.94A.

[42]*Cuevas-Diaz,* at 905-06.

[43]58 Wn. App. 465, 475, 794 P.2d 52 (1990), *aff'd, in part, rev'd in part,* 117 Wn.2d 701, 712, 818 P.2d 1088 (1991).

[44]53 Wn. App. 916, 928, 771 P.2d 746 (1989).

destructive nature that is not normally associated with the commission of the offense in question and this impact must be foreseeable to the defendant.[45]

The court in *Cuevas-Diaz* noted the trial court found the victim's children were traumatized by being in the house when their mother was sexually assaulted by the defendant, and compared those facts to *Barnes*, where the "other persons" were children in the house during a stabbing incident. The court also stated that "such a result is foreseeable to persons who unlawfully enter the private residence of another and commit an assault. Furthermore, the resulting trauma to the children distinguishes this offense from other assaults." The court concluded that "the impact of the offense on the children of the assault victim, alone, supports the exceptional sentence."[46]

In this case, the sentencing court found that the shooting by Petitioner Johnson occurred "immediately next to a public elementary school that was in session". There was testimony that witnesses to the shooting included children about to be released from school and their parents. The court also found that the children are now afraid to attend school and that parents fear for the safety of their children while at school.

Any person who discharges a deadly weapon at persons fleeing in automobiles in the immediate vicinity of a public elementary school while classes are in session should reasonably foresee that other persons, that is, children and their parents, who are not necessarily the intended victims, would be traumatized by those actions. As in *Cuevas-Diaz*, the resulting trauma to the children and their parents in this case distinguishes the offense from other assaults.[47]

We agree with the reasoning and conclusions of the Court of Appeals in *Cuevas-Diaz,* and conclude in this case that the impact of the shooting by Petitioner Johnson upon the

---

[45]*Cuevas-Diaz*, at 906 (citing *Crutchfield*, at 928).

[46]*Cuevas-Diaz,* at 906-07.

[47]*Cuevas-Diaz,* at 906-07.

children and their parents at the John Muir Elementary School supports a conclusion that the community impact of Petitioner's actions justifies the aggravated exceptional sentence imposed upon him.

## Mistrial

Petitioner Johnson claims error by the trial court in denying his motion for mistrial based upon an outburst by a woman during the State's closing argument in which she uttered angry words. She was eventually escorted out of the courtroom. He argues that her lack of self-control could have been associated with him since he called her "mom" several times, and could have caused the jury to infer that he might also lose his self-control and would more likely have committed the offenses for which he was being prosecuted.

In determining whether a trial court abused its discretion in denying a motion for mistrial, this court will find abuse "only 'when no reasonable judge would have reached the same conclusion.' "[48] "The trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly. Only errors affecting the outcome of the trial will be deemed prejudicial."[49] In determining the effect of an irregular occurrence during trial, we examine "(1) its seriousness; (2) whether it involved cumulative evidence; and (3) whether the trial court properly instructed the jury to disregard it."[50]

In this case the unidentified woman directed her remarks to the jury and the judge. She insulted the State's witnesses and asserted that her "son" was not a gang member. As the Court of Appeals observed, the comments "though likely startling, were not inherently prejudicial" to Petitioner.[51] We

[48]*State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989) (quoting *Sofie v. Fibreboard Corp.,* 112 Wn.2d 636, 667, 771 P.2d 711, 780 P.2d 260 (1989)).

[49]*Hopson*, at 284 (quoting *State v. Mak,* 105 Wn.2d 692, 701, 718 P.2d 407, *cert. denied,* 479 U.S. 995 (1986)).

[50]*Hopson*, at 284; *State v. Escalona,* 49 Wn. App. 251, 254, 742 P.2d 190 (1987); *State v. Weber,* 99 Wn.2d 158, 164-65, 659 P.2d 1102 (1983).

[51]*State v. Johnson,* 69 Wn. App. at 541.

fully agree with that court that "[t]here is no basis for concluding that the jury believed Johnson was more likely to be guilty of assault simply because it observed an agitated woman, who was purportedly Johnson's mother, insult state witnesses."[52]

■ The trial court properly instructed the jury to disregard the outburst. A jury is presumed to follow the court's instructions.[53] The trial court did not abuse its discretion in denying Petitioner Johnson's motion for mistrial.

### Miscellaneous Claims

Petitioner filed a pro se supplemental brief in which he claims several violations of his rights by the trial court. He claims he was not allowed to confront the witnesses against him because one of the persons whose fleeing automobile he penetrated with bullets, Taifa Griffith, was not available at trial. This claim is without merit. The testimony of four eyewitnesses was sufficient to prove beyond a reasonable doubt that Petitioner committed an assault against the absent Taifa Griffith.

Petitioner also claims the court allowed the prosecutor to elicit "perjured" testimony from Marvin Jones, named as the victim in count I, who testified at trial, because Mr. Jones had stated prior to trial that he believed 8 to 10 rounds were fired by Petitioner, when in fact there were only 4; and because Mr. Jones stated he did not believe that at the time of the shooting Petitioner was shooting at him, but later did realize Petitioner was shooting at him. This claim is without merit. The evidence establishes beyond a reasonable doubt that Petitioner fired a handgun, a deadly weapon, at Marvin Jones. The actual number of rounds fired is irrelevant. The later realization by Mr. Jones that he was being fired upon is not a contradiction of his initial belief that he was not a target. It merely represents his belief at different points in the rapid sequence of the shooting.[54] The evidence is clear

---

[52]*Johnson*, at 541.

[53]*Weber*, at 165-66; *Escalona*, at 254.

[54]See Verbatim Report of Proceedings (June 4, 1990), at 28-29.

that the fleeing automobiles occupied by Marvin Jones and Taifa Griffith had bullet holes and shattered windows caused by bullets fired from a handgun operated by Petitioner.

Petitioner also claims there were several instances of prosecutorial misconduct because the prosecutor injected his own subjective beliefs at trial. Each of these claims is without merit and each can be explained in the context of the entire record of proceedings.

Petitioner then claims he had ineffective assistance of counsel because counsel permitted violation of his rights. This claim is without merit. The record does not support a conclusion that any of Petitioner's rights were violated.

### SUMMARY AND CONCLUSIONS

The evidence supports the trial court's findings of fact and conclusions of law relating to "gang motivation" and "community impact". Nine months prior to the shooting Petitioner boasted to a Seattle police officer that he was a member of the Black Gangster Disciples (BGD) "street gang". There was testimony that at that time Petitioner had taken action to protect BGD "turf" from invasion by members of the "Crips", a rival "gang". The testimony in this case was that the shooting occurred immediately following a confrontation between members of the BGDs and the "Crips" on BGD "turf". There was also testimony that the shooting occurred in the immediate vicinity of John Muir Elementary School during school hours and that children and parents in the community have since become fearful and anxious about their safety at the school.

The findings by the trial court support the aggravated exceptional sentence imposed upon Petitioner Johnson which an appellate court must affirm unless it is "clearly erroneous".[55] The United States Supreme Court in *Dawson v. Delaware*[56] concluded that evidence of associations and

---

[55]*See* RCW 9.94A.210(4); *State v. Allert*, 117 Wn.2d 156, 163, 815 P.2d 752 (1991). *See also* RCW 9.94A.390(2); *State v. Estrella*, 115 Wn.2d 350, 357, 798 P.2d 289 (1990).

[56]503 U.S. 159, 117 L. Ed. 2d 309, 112 S. Ct. 1093 (1992).

beliefs is admissible at sentencing if it is relevant to the defendant's motivation for committing the charged offense. Also, this court has upheld statutorily enhanced sentences imposed for some crimes committed within 1,000 feet of a school[57] and aggravated exceptional sentences for crimes where "other persons", especially children, were traumatized by the crime.[58]

The State did not violate the "real facts" concept of RCW 9.94A.370(2) and *State v. Barnes supra*, in not charging Petitioner with "leading organized crime" or with criminal conspiracy. Neither the evidence nor the findings in this case constitutes the crime of "leading organized crime", which requires inciting violence to accomplish "a pattern of criminal profiteering activity" under RCW 9A.82.060(1)(a) and (b), nor criminal conspiracy under RCW 9A.28.040. There was no evidence that Petitioner Johnson was a leader in the Black Gangster Disciples. There was no evidence of a conspiracy.

The trial court did not err in denying Petitioner's motion for mistrial because of the outburst by the woman in the courtroom. The outburst did not prejudice the jury against Petitioner Johnson and, besides, the court properly and adequately instructed the jury to disregard it.

Petitioner's pro se claims are also without merit.

We affirm the decision of the Court of Appeals which affirmed the aggravated exceptional sentence imposed upon Petitioner Antwon Lanell Johnson by the King County Superior Court.

ANDERSEN, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DURHAM, GUY, JOHNSON, and MADSEN, JJ., concur.

Reconsideration denied August 23, 1994.

---

[57]*See State v. Coria, supra.*

[58]*See State v. Barnes, supra.*