8

[No. 29927-5-II.   Division Two.   February 18, 2004.]

THE STATE OF WASHINGTON, *Respondent*, v. STEVEN WIRTH, *Appellant*.

*Peter B. Tiller* (of *Rock & Pine*), for appellant.

*Jeremy R. Randolph, Prosecuting Attorney*, and *Terri J. Gailfus, Deputy*, for respondent.

HUNT, C.J. — Steven Wirth appeals his conviction of one count of second degree rape of a child, arguing that (1) the trial court erred when it replaced an ill juror with an alternate juror and instructed the jury to start deliberating anew; (2) the trial court erred by admitting evidence of Wirth's prior uncharged sexual misconduct; and (3) trial counsel's failure to request a limiting instruction regarding the evidence of past sexual conduct with the victim was ineffective assistance of counsel. We disagree and affirm. We also grant the State's request that Wirth pay all allowable costs of this appeal.

## FACTS

### I. RAPE

S.W. grew up living primarily with her father, defendant Steven Wirth, and her sister D.W.[1] S.W. alleged that her father, Steven Wirth, had repeatedly sexually abused her. S.W. claims she first told her grandmother about the sexual assaults sometime between 1995 and 1997, when S.W. was around 9 or 10 years of age. S.W. said that her grandmother then confronted Wirth about the incidents, and that, after first denying the allegations, he eventually admitted them and promised he would not have any further sexual contact with S.W. Sometime around 1999, while S.W. was playing "truth or dare" with her friends Holly and Chris, she told

---

[1] S.W. testified that her grandmother—Wirth's mother—and her aunt and uncle sometimes lived with them. S.W.'s mother had stopped living with the family in 1989, when S.W. was in preschool.

them that Wirth had raped her. 1 Report of Proceedings (RP) at 74.

Later, when S.W. was in ninth grade, she completed a school assignment in which she wrote about how her family affected her life. S.W. described her family life as "all screaming and yelling, . . . fighting, screaming fests" and revealed that Wirth had given S.W. green and yellow bruises around her eyes. 1 RP at 76. After reading S.W.'s paper, her teacher sent her to the counselor's office. The counselor called Child Protective Services (CPS). Two days later, a CPS social worker, Kim Gabbard, interviewed S.W. in the presence of the principal and S.W.'s friend Holly.

S.W. first told Gabbard that her father had physically abused her. Gabbard then informed S.W. that CPS could not remove her from the home unless there was sexual abuse, or drug or alcohol use. Holly then told Gabbard about the sexual abuse. Gabbard notified the sheriff's department.

## II. PROCEDURE

The State charged Wirth with five counts of first degree rape of a child[2] and, in the alternative, five counts of second degree rape of a child.[3]

In a pretrial motion at Wirth's second trial,[4] the State moved to admit all of the sexual history between Wirth and S.W. as showing lustful disposition under ER 404(b). The State made an offer of proof, and the court heard testimony from S.W. outside the jury's presence.

S.W. testified that Wirth had anal intercourse with her approximately five times while they lived in Tennessee, when she was seven or eight years old. She also testified that (1) the abuse continued after the family moved to Texas, where Wirth had anal intercourse with her on three more occasions; (2) while on vacation in Alaska with S.W.

---

[2] RCW 9A.44.073.

[3] RCW 9A.44.076.

[4] Wirth's first trial ended in a deadlocked jury.

and D.W., Wirth had tried to get S.W. to perform fellatio on him, but she refused; and (3) Wirth later attempted to perform cunnilingus on S.W., but stopped when D.W. woke up, saw Wirth under S.W.'s blanket, and started crying.[5]

The trial court heard argument and granted the State's motion. The court ruled that the testimony's probative value outweighed its prejudice and admitted it as showing Wirth's disposition.

At trial, in addition to recounting the sexual history between her and her father, S.W. also testified to abuse that occurred after her family moved to Washington when S.W. was nine years old. S.W. stated that when she was between 11 and 13 years old, living in Mossyrock, her father had sexual contact with her on multiple occasions, explaining that he had sexual intercourse with her and had digitally penetrated her vagina, and that she had performed fellatio on him. S.W. also recounted an incident that occurred after the family moved to Onalaska, when Wirth, S.W., and D.W. were all sleeping together on a mattress on the floor of their mobile home: S.W. had wakened to find Wirth trying to pull her underwear aside with his toes, and he then penetrated her vagina with his toes.

Detective Stacy Brown testified that when she questioned Wirth about the incident involving penetrating S.W. with his toes, he said, "If I say what she said I did, what will happen?" 2 RP at 74. He also asked what the course of treatment would be. Wirth said that he was "not inclined to give anything that will go against [him]." 2 RP at 75.

S.W.'s grandmother testified at trial that (1) S.W. had "half-heartedly" disclosed that Wirth had "touched" her, 2 RP at 40; (2) when she told Wirth about S.W.'s disclosure, he denied it and said "something like" he would never do it again, 2 RP at 40-41; and (3) she had never discussed any of S.W.'s sexual allegations that led to the charges against Wirth.

---

[5] None of these incidents formed the basis for any of the counts charged in the amended information. All of the charges in the amended information stem from sexual contact that S.W. alleged had occurred in Washington.

D.W. testified that (1) she and S.W. fought quite frequently; (2) S.W. hurt her numerous times during these scuffles; and (3) Wirth frequently disciplined the girls for this behavior. D.W. denied that she saw Wirth and S.W. engaging in sexual activities during the Alaska trip or at any other time when they lived in Washington.

The day after the jury began deliberations, the foreperson sent a note to the judge saying:

> We have arrived at a verdict. Question: Procedure in reference to "5 counts". How to deal with the "5 counts" issue. . . . There are "5 counts" of 1st Degree, "5 counts" of 2nd degree . . . . We have arrived at decisions in reference to both *sets* of charges. How do we discern which "count" we are referring to?

Clerk's Papers (CP) at 32, 33.

While the trial court was addressing this question, a juror fell ill and was taken to the hospital. The jury sent another note to the judge stating: "Ill juror was part of total deliberation. Verdicts were made prior to her becoming ill." CP at 34. The trial court sent a note to the jury instructing them to "cease deliberations until the alternate juror is in attendance." CP at 35.

Finding this information insufficient to satisfy the requirements of CrR 6.5, the trial court substituted alternate juror number 13. The court and defense counsel conducted a brief voir dire to determine whether juror 13 had had any contact with any third party about the case.

The trial court provided the jury with a supplemental instruction to disregard all previous deliberations and to begin deliberating anew with juror 13. Defense counsel objected to seating juror 13 and requested a mistrial, arguing, inter alia, that the jury had completed its deliberations and had rendered a verdict. The court denied the motion for a mistrial.

The jury convicted Wirth of one count of second degree rape of a child. Wirth appeals.

## ANALYSIS

### JUROR SUBSTITUTION

■ Wirth contends that the trial court erred by replacing an ill juror with an alternate juror under CrR 6.5 after the jury declared they had reached a verdict. The question before us is whether the jury's "verdict" in this case was sufficiently final to preclude the trial court's substitution of the alternate juror and ordering the jury to begin deliberations anew. We review the trial court's decision to replace a juror with an alternate juror for abuse of discretion. *State v. Johnson*, 90 Wn. App. 54, 73, 950 P.2d 981 (1998). An abuse of discretion exists when a trial court's exercise of its discretion is manifestly unreasonable or based upon untenable grounds or reasons. *Davis v. Globe Mach. Mfg. Co.*, 102 Wn.2d 68, 77, 684 P.2d 692 (1984). Finding no abuse of discretion, we reject Wirth's claim of error.

■ CrR 6.5 permits the trial court to substitute an alternate juror for a regular juror who is unable to serve. CrR 6.5 requires that if the alternate juror is seated after deliberations begin, the court shall instruct the jury to "disregard all previous deliberations and begin deliberations anew." This is what the trial court did here. After substituting the alternate juror for the ill juror, the trial court instructed the jury as follows:

> During this trial, Juror No. 13 was an alternate juror. Juror No. 13 has now been seated as a juror in this case. You are instructed to disregard all previous deliberations and begin deliberations anew.

CP at 37. We presume that the jury followed the trial court's instruction. *State v. Johnson*, 124 Wn.2d 57, 77, 873 P.2d 514 (1994).

"[A] jury's action does not become a verdict until it is finally rendered in open court and received by the trial

14

judge."[6] A jury returns a verdict when all members have agreed upon the verdict and the presiding juror completes and signs the verdict form, returning it to the judge in open court. CrR 6.16(a)(2). Former RCW 4.44.460 (2002) provided that a jury's verdict was not final until the court received the verdict and the clerk filed the "complete" verdict; the court then discharged the jury. Former RCW 4.44.460 (statute made applicable to criminal cases in *State v. Badda*, 68 Wn.2d 50, 61, 411 P.2d 411 (1966)).

Here, the jury notified the trial court via two separate notes that it had reached verdicts on all counts, that the replaced juror had participated in "total deliberation," and that the verdicts were complete before the juror took ill. CP at 34. The jury foreman did not, however, sign or return any verdict form to the trial court before it replaced the ill juror. Nor was the verdict announced in open court, received by the court, and filed.

Thus, regardless of the jury foreman's assessment of the verdict status and deliberations, our state's case law, statutes, and court rules provide that the jury's work is not complete and the verdict is not final until it is rendered in open court and received by the trial court. Accordingly, we hold the trial court did not abuse its discretion when it exercised its authority under CrR 6.5 to replace the ill juror and instructed the jury to start its deliberations over.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

HOUGHTON, J., concurs.

---

[6] *State v. Robinson*, 84 Wn.2d 42, 46, 523 P.2d 1192 (1974) (citing *Bino v. Veenhuizen*, 141 Wash. 18, 250 P. 450 (1926); *State v. Badda*, 68 Wn.2d 50, 411 P.2d 411 (1966)). *Cf. Beglinger v. Shield*, 164 Wash. 147, 152, 2 P.2d 681 (1931) (trial court may send verdict back to jury for clarification or correction after it has been read but before it has been filed and received).

MORGAN, J. (dissenting) — I would reverse on the issue of substituting an alternate juror. I believe that CrR 6.5 authorizes a trial court to substitute an alternate during deliberations *before the jury has reached a decision.* I do not believe that CrR 6.5 authorizes a trial court to substitute an alternate during deliberations *after the jury has reached a decision,* at least where, as here, the jury has announced that fact in a note sent to the judge. I do not believe that 11 members of a jury, having already reached agreement and announced that fact to the court, can start over even if instructed to do so.

I do not overlook that a jury is presumed to follow its instructions, or that the trial court here instructed the remaining 11 jurors to start over. *Bruton v. United States,* 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), held that even if instructed to do otherwise, a jury could not reasonably be expected to refrain from using A's pretrial confession against B when A and B are on trial together and A's confession implicates both. Similarly, *Jackson v. Denno,* 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), held that even if instructed to do otherwise, a jury could not reasonably be expected to disregard a confession that was true but involuntary. The presumption that a jury follows its instructions has limits, and those limits have been reached and exceeded in this case. Indeed, the clerk's minutes in this very case show that the original jury deliberated for about 10 hours, while the second jury—the one with the alternate—deliberated for only about 45 minutes.

I attach no importance to the idea that a jury's verdict becomes final only when formally received in open court. The question here is not whether the verdict was or was not final, but whether the deliberations that *led up to* the verdict were improperly conducted.

I respectfully dissent.

Review denied at 152 Wn.2d 1018 (2004).