IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32295-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD EDWARD KREBS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Richard Edward Krebs appeals his convictions of felony harassment, reckless driving, and driving under the influence, charged after he drove his sport-utility vehicle (SUV) headlong toward logging trucks in what was apparently an inebriated, road-rage-induced game of "chicken." He argues he was denied due process when a sheriff's deputy testified at trial that Mr. Krebs "lawyered up" rather than submit to a blood alcohol test.

We agree that the deputy's reference to Mr. Krebs "lawyering up" contradicted assurances given to Mr. Krebs in *Miranda*[1] warnings, thereby violating his right to due process. The error was harmless, however, where Mr. Krebs's objection to the deputy's

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

statement was sustained, the jury was told to disregard it, the State made no effort to capitalize on the statement, and the evidence against Mr. Krebs was overwhelming. Because the error was harmless and a statement of additional grounds filed by Mr. Krebs is meritless, we affirm his judgment and sentence.

FACTS AND PROCEDURAL BACKGROUND

In January 2011, Richard Krebs was involved in a one-vehicle rollover accident on a forest road. His version of events—that he was being tailgated by logging trucks, one of which ran him off the road—was disputed by other witnesses.

At trial, Ken Sellers, a log truck driver, testified that he was driving his log truck on a two-lane highway when he passed Mr. Krebs's vehicle, a small Honda SUV. After Mr. Sellers passed him, Mr. Krebs immediately accelerated and pulled up behind the log truck, tailgating so closely that Mr. Sellers could no longer see him. Thinking that his truck might have kicked up a rock that struck Mr. Krebs's SUV, Mr. Sellers pulled over and stepped out to see what was wrong. One of Mr. Sellers's responsibilities as a driver was to provide insurance information to another driver if the log truck might have caused damage.

Mr. Sellers walked toward Mr. Krebs, who had stopped behind him, and asked, "'What, did I hit you or something?'" Report of Proceedings (RP) at 77. As Mr. Sellers walked toward Mr. Krebs's SUV, he checked over his shoulder for any traffic coming from behind and when he turned forward again, Mr. Krebs was "coming straight at me."

2

RP at 78. Mr. Sellers testified that he jumped out of the way, "tr[ying] to move as fast as I could," but that Mr. Krebs's passenger side mirror clipped his hand. *Id.* Mr. Krebs then stopped again, this time in front of the log truck.

Mr. Sellers walked toward the SUV a second time and upon reaching it, initially held the driver's side door closed, to prevent Mr. Krebs from opening it. He attempted to talk to Mr. Krebs while satisfying himself that Mr. Krebs did not have a weapon. Mr. Sellers let Mr. Krebs know that he had been hit in the close encounter, and inquired again about what he had done wrong. Mr. Krebs's only response was to get out of the SUV, straighten the passenger side mirror that had clipped Mr. Sellers's hand, and mumble words to the effect that "'We've got a goddamn issue here,' or, 'We've got a goddamn problem.'" RP at 83-88. Mr. Krebs then got back in his SUV and drove off.

Mr. Sellers returned to his own truck and continued down the highway. He had only traveled about a quarter mile when he saw Mr. Krebs driving his SUV toward Mr. Sellers's truck in Mr. Sellers's lane of travel. Mr. Krebs did not turn away until the last second.

Once was evidently not enough; further down the road, Mr. Krebs drove at Mr. Sellers a second time, which Mr. Sellers described at trial as follows:

> Q. What are you thinking this time?
> . . . .
> A. This guy—this—this person has—has some severe issues, or a death wish.
> Q. What are you thinking is going to happen?

3

A. Wake up, Leroy. We're fixing to have us a wreck.

Q. Okay.

A. I mean, you know, it's—I'm on the brakes again, on the air horn again, and the only difference is this time, he's got two hands up in the windshield, just like this right here—(Witness gestures.)—shooting me the finger. He yanks the wheel over at the last second.

RP at 95. After this second charge at his log truck, Mr. Sellers drove to a location where he knew there was a phone available and called to report Mr. Krebs's confrontational driving to the highway patrol. Because Mr. Sellers could not provide a license plate number, he was told the patrol was unable to do anything.

Mr. Sellers then began the drive back to his jobsite. After leaving the highway for the forest road leading to where the log trucks loaded (referred to by some witnesses as a "haul" road), Mr. Sellers saw Mr. Krebs's SUV overturned off the side of the road. He stopped and identified himself to responding deputies as the driver who had just called to report the same SUV to the highway patrol.

James Barton, also a log truck driver, corroborated Mr. Sellers's testimony that Mr. Krebs was driving recklessly. Mr. Barton was driving his own log truck that day when Mr. Sellers told him over citizens band (CB) radio about the encounter he had just had with the SUV. Mr. Barton then saw the SUV driving toward him, although in its own, opposite lane of travel. After passing Mr. Barton's truck, Mr. Krebs made a U-turn and pulled behind the car that was behind Mr. Barton. Mr. Barton could see in his rearview mirrors that Mr. Krebs was driving erratically, crossing over the double yellow

lines at times and trying to catch up to him. Cars in the oncoming lane of traffic had to pull onto the shoulder to avoid colliding with Mr. Krebs.

When Mr. Barton pulled off the highway onto the forest road that would take him to where his truck was to be loaded, Mr. Krebs followed him and attempted to pass him. Concerned about staying in control of the situation, Mr. Barton moved to block Mr. Krebs from passing. When Mr. Barton pulled his truck off of the forest road onto the logging spur where his truck would be loaded, Mr. Krebs continued up the road and turned around. On his return, he stopped and glared at Mr. Barton before driving off down the forest road behind another log truck.

Robert McEldoon, a volunteer firefighter and emergency medical technician (EMT) who also works for a logging company, was at work on the day of the accident when he heard over the CB radio that a Honda SUV had rolled off the haul road. Mr. McEldoon and his supervisor, Scott Keatley, went to the scene of the accident to assist. The SUV had come to rest against a tree on its passenger side. Mr. Krebs was dangling by the seatbelt in the driver's seat.

Mr. McEldoon testified that he spoke to Mr. Krebs while Mr. Keatley held the driver's door partway open using a pipe. Both Mr. McEldoon and Mr. Keatley testified that an odor of consumed alcohol was coming from Mr. Krebs. Mr. Krebs was struggling to get out of his seatbelt, so Mr. McEldoon offered to cut him out. When he did so, Mr.

Krebs fell to the passenger side of the vehicle. After he fell, Mr. Krebs had difficulty locating the ignition and removing the key as requested by Mr. McEldoon.

Mr. McEldoon and Mr. Keatley testified that throughout their encounter Mr. Krebs kept repeating that he wanted to die and, after a time, Mr. Krebs told them to get away from his SUV or he would kill them. According to Mr. Keatley, Mr. Krebs stated that he had a grenade. When Mr. Krebs persisted with his threats, both men moved to the road to wait for law enforcement to arrive. Mr. Krebs's threats continued with the arrival of sheriff's deputies and an ambulance; Mr. Keatley testified that Mr. Krebs threatened paramedics who arrived and approached the SUV, saying "'I'm going to fucking kill you.'" RP at 168-69.

Tom Ryan, a paramedic, attended to Mr. Krebs as he was driven to the hospital. He described Mr. Krebs as "[l]ess than cooperative," explaining that Mr. Krebs refused medical care that was indicated for his complaints. RP at 186. He testified that Mr. Krebs's demeanor vacillated between cooperative and unpleasant. Mr. Ryan testified that Mr. Krebs admitted to consuming alcohol prior to the accident.

Deputy Brady Spaulding was the first law enforcement officer to arrive at the scene of the accident. He testified that when he approached the SUV, it smelled of consumed alcohol and that after pulling Mr. Krebs out of and away from the SUV, it was obvious that the smell was coming from Mr. Krebs. He testified that he and another deputy pulled Mr. Krebs the 10 to 15 feet up the hill to the roadway and turned him over

to Mr. Ryan for care. The deputy testified that upon arrival at the hospital, Mr. Krebs was unable to walk without bracing himself against walls and counters for support. His face was flushed; he had watery, bloodshot eyes; his speech was slurred; and his breath smelled of alcohol.

Deputy Spaulding advised Mr. Krebs of his *Miranda* rights. Mr. Krebs stated he understood those rights and initially answered the deputy's questions about the accident, telling the officer about being tailgated and run off the road by a logging truck. When the deputy asked how much Mr. Krebs had to drink before the accident, Mr. Krebs first said he had had 14 drinks, then said he had not had even one. The deputy replied to Mr. Krebs that it was obvious he had been drinking, after which Mr. Krebs admitted drinking half a beer as he was driving home. Mr. Krebs declined to submit to a blood alcohol test.

The State charged Mr. Krebs with hit and run, driving under the influence, reckless driving, and two counts of felony harassment based on the incidents leading up to and immediately following the accident.

Mr. Krebs's assignments of error on appeal arise from testimony at trial by Deputy Spaulding about what happened when the deputy asked him to submit to a blood alcohol test. Having concluded that Mr. Krebs was intoxicated, the deputy read Mr. Krebs the implied consent warnings for blood alcohol testing. The following is the exchange at trial that led to the issue on appeal:

Q. You then placed him under arrest?

7

A. At that point, I read him his implied consent for blood.
Q. Okay. And—
A. Given my observations and belief that he was under the influence.
Q. Alright. So, you did not get blood from him?
A. I did not. He refused. He lawyered up at that point.
MR. BALDWIN: Objection.
JUDGE HAAN: Sustained.
MR. BALDWIN: Can we approach, Your Honor?
JUDGE HAAN: Jury will disregard that last statement.

RP at 226-27.

Mr. Krebs's lawyer promptly moved for a mistrial on the basis of the deputy's reference to Mr. Krebs "lawyer[ing] up." The court excused the jury in order to hear argument outside its presence. The court recessed for a half hour so that it and the lawyers could briefly research pertinent case law. After hearing argument from counsel, the trial court denied Mr. Krebs's motion for mistrial. It reasoned that the State did not ask a question designed to elicit testimony on Mr. Krebs's decision to quit speaking and request a lawyer, the deputy's statement was only an indirect comment on the defendant's right to silence, and the court's direction to the jury to disregard the statement was sufficient to cure any harm. The court later entered written findings of fact and conclusions of law to support its ruling.

The jury found Mr. Krebs guilty of all charges other than felony hit and run. He appeals.

8

ANALYSIS

The sole issue on appeal is whether Deputy Spaulding's testimony that Mr. Krebs "lawyered up" was a direct comment on his exercise of his right to remain silent, violating his right to due process.[2]

Commenting on postarrest silence raises a constitutional concern grounded in due process. Warnings under *Miranda* given upon arrest "constitute an 'implicit assurance' to the defendant that silence in the face of the State's accusations carries no penalty," making it fundamentally unfair to then penalize the defendant by offering his silence as evidence of guilt. *State v. Easter*, 130 Wn.2d 228, 236, 922 P.2d 1285 (1996) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993); *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976)). For the government to comment on post-*Miranda* silence is to "[break] its promises given in the *Miranda* warnings and violate[ ] due process of law." *State v. Burke*, 163 Wn.2d 204, 213, 181 P.3d 1 (2008). The State impermissibly uses a criminal defendant's postarrest exercise of the rights stated in the *Miranda* warning as substantive evidence of guilt when it elicits testimony from a police officer that the defendant chose to remain silent or consult with an attorney. *Easter*, 130 Wn.2d at 236; *State v. Curtis*, 110 Wn. App. 6, 9, 37 P.3d 1274 (2002).

---

[2] In a pro se statement of additional grounds for review, Mr. Krebs lists 11 apparent but obscure complaints about the trial. None is sufficiently identified or explained. We decline to review them as meritless. *See* RAP 10.10(c).

9

The State points out that Deputy Spaulding's reference to Mr. Krebs's request for an attorney was in response to the prosecutor's questions about Mr. Krebs's refusal to provide a blood sample. It argues that evidence of a defendant's refusal to submit to a blood test is not communicative testimonial evidence; rather, it is "'conduct indicating a consciousness of guilt.'" *City of Seattle v. Stalsbroten*, 138 Wn.2d 227, 234, 978 P.2d 1059 (1999) (quoting *Newhouse v. Misterly*, 415 F.2d 514, 518 (9th Cir. 1969)). It is well settled that the State may offer evidence of a defendant's refusal to give a blood or breath sample and may argue that the refusal is conduct indicating consciousness of guilt.

Here, Deputy Spaulding's answer to the question whether he had obtained blood from Mr. Krebs answered that question ("*I did not. He refused.*") but then went beyond the question to add, "He lawyered up." RP at 226 (emphasis added). We may take judicial notice of the fact that "lawyered up" is slang for exercising a right to legal representation; that in the context of police work, it is most commonly used to describe exercising the right to remain silent;[3] and that in current vernacular, especially as used by

---

[3] See, for example, Urban Dictionary, which defines "lawyer up" as, "To plead the Fifth Amendment; to refuse to answer questions"; and Wiktionary, which defines it as, inter alia, "To exercise one's right to legal representation, especially on the occasion of refusing to answer law-enforcement officials' questions without the presence of such legal representation." URBANDICTIONARY.COM, http://www.urbandictionary.com/define.php?term=lawyer+up (last visited August 4, 2014); WIKTIONARY.ORG, http://en.wiktionary.org/wiki/lawyer_up (last modified June 19, 2013).

law enforcement, it is reasonably understood to have a derogatory connotation. *See* ER 201(b) (a judicially noticed fact may be one that is not subject to reasonable dispute in that it is generally known within the territorial jurisdiction of the court). The fact that the trial court immediately sustained defense counsel's objection to the deputy's use of "lawyered up," immediately instructed the jury to disregard the reference, and took a 30-minute recess to prepare for the defense motion for a mistrial demonstrates that it, too, recognized this generally understood meaning of "lawyering up."

Comments on a defendant's reliance on the *Miranda* assurance of a right to remain silent may be direct or indirect. A direct comment makes a clear reference to the defendant's invocation of his or her right to remain silent. *Burke*, 163 Wn.2d at 216. Such comments are used as substantive evidence of guilt or suggest to the jury that the silence was an admission of guilt. *State v. Lewis*, 130 Wn.2d 700, 707, 927 P.2d 235 (1996). An indirect reference to the right to remain silent occurs when a witness refers to a comment or an action by the defendant that could be inferred as an attempt to exercise the right to remain silent. *State v. Pottorff*, 138 Wn. App. 343, 347, 156 P.3d 955 (2007). Indirect references are so subtle and brief that they do not necessarily emphasize the defendant's testimonial silence. *Burke*, 163 Wn.2d at 216 (quoting *State v. Crane*, 116 Wn.2d 315, 331, 804 P.2d 10 (1991)).

In *State v. Romero*, the arresting officer testified that the defendant was somewhat uncooperative and that he "'read him his *Miranda* warnings, which he chose not to

11

waive, would not talk to me.'" 113 Wn. App. 779, 785, 54 P.3d 1255 (2002) (footnote omitted). The court held that this was an impermissible direct comment on the defendant's reliance on his right to remain silent. *Id.* at 793. Similarly, an officer's testimony that he read a defendant his *Miranda* rights and the defendant refused to talk, stating he wanted an attorney, was held to constitute a direct comment on the defendant's election to remain silent in *Curtis*, 110 Wn. App. at 9. In *Easter*, the court treated an arresting officer's testimony that a defendant did not answer him and looked away without speaking, in a manner the officer characterized as evasive, as a direct comment on the defendant's right to remain silent.

Review standards differ depending on whether a comment is direct or indirect. *Romero*, 113 Wn. App. at 790-91. If the comment is a direct comment, constitutional error exists that requires constitutional harmless error analysis. *Easter*, 130 Wn.2d at 241. Prejudice resulting from an indirect comment is reviewed using the lower, nonconstitutional harmless error standard to determine whether no reasonable probability exists that the error affected the outcome. *Romero*, 113 Wn. App. at 791-92. If the error was not harmless, the judgment must be reversed and remanded for a new trial. *Easter*, 130 Wn.2d at 242.

Given the current import of "lawyering up," Deputy Spaulding's nonresponsive statement is, like the officers' statements in *Romero*, *Curtis*, and *Easter*, a direct

12

comment on Mr. Krebs's election to remain silent. But we conclude that it was harmless, even under the constitutional harmless error standard.

Any prejudice was limited, given the context in which the statement was made and its isolated character. The deputy volunteered Mr. Krebs's request for a lawyer in response to a question intended to elicit something else. The trial court immediately sustained the objection and instructed the jury to disregard the deputy's statement. The State agreed not to make further use of the statement and abided by that agreement. Moreover, the jury heard testimony that Mr. Krebs had agreed to speak with the deputy at some length before being read implied consent warnings for a blood test and cutting off communications—and as previously noted, the jury was entitled to infer consciousness of guilt from the refusal to submit to the blood test. Neither the prosecutor nor the deputy suggested that the jury should infer guilt from Mr. Krebs's refusal to speak further with the deputy. *See Lewis*, 130 Wn.2d at 706 ("Most jurors know that an accused has a right to remain silent and, absent any statement to the contrary by the prosecutor, would probably derive no implication of guilt from a defendant's silence.").

Constitutional error is harmless only if the reviewing court is convinced beyond a reasonable doubt that any reasonable jury would reach the same result absent the error and where the untainted evidence is so overwhelming it necessarily leads to a finding of guilt. *Burke*, 163 Wn.2d at 222. Here, two nonpolice witnesses testified to Mr. Krebs's threatening and erratic driving, and Mr. Sellers had made a contemporaneous report to

13

Mr. Barton and the highway patrol before coming across the accident site. Three other nonpolice witnesses (including a volunteer firefighter/EMT and a paramedic) testified to Mr. Krebs's erratic and sometimes threatening behavior, as well as to the odor of consumed alcohol on his person and aspects of his appearance and behavior suggesting that he was inebriated. The deputy described a number of facts about Mr. Krebs's appearance and behavior that suggested intoxication. Both the paramedic and the deputy testified that Mr. Krebs admitted he had been drinking—in the case of the deputy, Mr. Krebs initially admitted having consumed 14 drinks. This untainted evidence was overwhelming.

In addition to assigning error to the due process violation, Mr. Krebs assigns error to the trial court's denial of his motion for a mistrial. We review a trial court's denial of a motion for a mistrial for abuse of discretion. A trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly. *State v. Johnson*, 124 Wn.2d 57, 76, 873 P.2d 514 (1994).

While the trial court found that the deputy's comment on Mr. Krebs's exercise of his right to remain silent was indirect and we have concluded that it was direct, our conclusion that the error was harmless comports with the trial court's conclusion that a mistrial was not warranted. The trial judge is best suited to judge the prejudice of a statement. *State v. Weber*, 99 Wn.2d 158, 166, 659 P.2d 1102 (1983). Given the isolated

No. 32295-5-III
*State v. Krebs*

nature of the deputy's reference and the court's instruction to the jury to disregard it, the

trial court did not abuse its discretion in denying the motion for a mistrial.

Affirmed.

A majority of the panel has determined that this opinion will not be printed in the

Washington Appellate Reports but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Lawrence-Berrey, J.