# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| Respondent, | ) ) | No. 69814-1-I |
| v. | ) ) | UNPUBLISHED OPINION |
| AENOY PHASAY, a.k.a. ARNOY PHASAY, | ) ) ) | |
| Appellant. | ) ) ) | FILED: November 16, 2015 |

DWYER, J. — Aenoy Phasay was convicted of one count of murder in the second degree and one count of felony murder in the second degree for shooting and killing Tom Bennett, Sr. On appeal, Phasay contends that (1) the trial court erred by refusing to admit certain ER 404(b) evidence, (2) the trial court erred by denying Phasay a mistrial, (3) the trial court improperly admitted certain expert testimony, (4) the prosecutor engaged in misconduct by offering evidence and making arguments that impugned defense counsel and Phasay's right to counsel, (5) the trial court erred by admitting evidence suggesting that Phasay had a duty to retreat, and (6) Phasay was denied the effective assistance of counsel. Finding no error, we affirm.

I

At roughly 11:00 p.m. on March 29, 2010, 19-year-old Thomas Bennett, Jr., (Thomas) was with his mother at the Edgewood home they shared with Thomas's father, Tom Bennett, Sr. (Bennett). Hearing a knock at the front door, Thomas's mother asked him to see who it was. As Thomas arose, he heard a loud crash and then saw a group of three masked, armed men enter his room.

The men tied up Thomas and his mother and demanded to know: (1) how to get downstairs, (2) where the owner of a particular vehicle was, and (3) where the safe inside the home could be found. Thomas told the men that the owner of the vehicle was his father and that he was not home. As to the safe, Thomas explained to the men that there was none; while the family had a safe at their former residence, they did not have one at the Edgewood home.

In response, one of the intruders pistol-whipped Thomas while others punched his mother. While one man remained with the now-hostages, the others left Thomas's room and ransacked the rest of the family's home. After approximately 10 minutes, the intruders left the house and drove off. Thomas managed to extricate himself and then untied his mother, who asked him to phone Bennett.

When Bennett returned home soon thereafter, he speculated that Aenoy Phasay had orchestrated the home invasion robbery.[1] Bennett suspected Phasay's involvement in the robbery because Phasay had known about the safe in the former home and because Phasay and Bennett had recently been in a

---

[1] Phasay had, years earlier, fathered a child with Bennett's stepdaughter. After Phasay's relationship with Bennett's stepdaughter ended, she married Phasay's brother, Mark.

dispute about a debt for car repairs that Bennett, a professional mechanic, had performed for Phasay. Bennett decided to seek out Phasay, and drove with Thomas to Kent, where Phasay owned a tattoo shop.

During the drive, Bennett told Thomas that he wanted to confront Phasay, look into his eyes, and see if Phasay would tell him the truth. Thomas managed to contact Phasay by telephone, and falsely claimed that his car had a flat tire and that he needed Phasay's assistance. Phasay suggested that Thomas instead try to contact Bennett for assistance. When Thomas said that he had been unable to contact his father, Phasay replied, "Business is business, don't [fuck] with the wrong people." Thomas asked Phasay to explain what he meant, but Phasay disconnected instead of answering.

Bennett, now convinced of Phasay's culpability, decided to drive home. However, en route Bennett decided to phone Phasay one more time, and Phasay answered. Bennett told Phasay about the events at his home and said that he wanted to meet Phasay in person and ask him if he had anything to do with it. Phasay agreed to meet with Bennett in the parking lot of a Top Foods grocery store in Auburn.

Bennett arrived with Thomas at the parking lot before Phasay, and the pair awaited his arrival. When Phasay walked into the lot, shortly after 3:00 a.m., Bennett accelerated toward him, abruptly stopped, and told Phasay to get into Bennett's vehicle. Phasay declined, and said that he had not been involved in the robbery. Bennett got out of the car and began yelling at Phasay, who continued to maintain his innocence.

- 3 -

At some point, the two began fighting. Phasay, who was much smaller than Tom, begged Thomas to get Bennett off of him. Thomas managed to gain control of Bennett and convinced him to return to their vehicle. Thomas returned to the front passenger seat, and the pair prepared to leave.

While Bennett's head was turned away from his door, Phasay walked up and "sucker punched" him twice in the head.[2] Thomas thought that they were going to start fighting again and prepared to intercede. Thomas explained to the jury that neither he nor his father was armed.

While Bennett was putting his car's transmission into "park" and preparing to step outside, Thomas saw that Phasay had taken a step back and had produced a handgun, which he pointed at Bennett. Thomas fled from his seat, hid behind the vehicle, and heard a series of gunshots.

Thomas then stood up to find Phasay walking toward him, pointing his gun at Thomas. Thomas begged for his life. Phasay told him, "Don't say a word," and ran from the scene.[3] Thomas then walked to his father, who appeared lifeless, and called 911.

Responding Auburn Police Department (APD) officers found Bennett lying face down next to the opened driver's-side front door of his vehicle. Bennett's right foot was still inside the passenger compartment, indicating that he had not completely exited the vehicle before he was shot. Bennett had no pulse, and had gunshot wounds to his head and torso.

___

[2] Although Thomas initially testified that the driver's side window was open, he later admitted that, if the police said the window was closed, he must have been mistaken on that point and the door must have still been open.

[3] According to Phasay, he told Thomas something to the effect of, "Man, I'm out of here, don't say nothing" and left.

Autopsy results indicated that Bennett had been shot twice. One bullet entered Bennett's head above his right ear. The examining pathologist found no sign that this shot was fired at close range, indicating that it was shot from some distance. The second gunshot entered Bennett's upper back and exited through his chest. It appeared to have been fired in a downward direction. Either wound would have been lethal on its own.

Bennett also had an abrasion on the back of his head, distinct from the gunshot wound, as well as wounds on his face consistent with falling face-first to the ground without making any effort to stop the fall. Dr. Jon Nordby, a ballistics and forensic evidence scientist, explained to the jury that the abrasive injury on the back of Bennett's head was consistent with being physically struck by a gun.

Thomas identified Phasay to police as his father's killer. Phasay was arrested at his home later that morning. During a lengthy videotaped interview with APD detectives, Phasay admitted his responsibility but asserted that he acted in self-defense.

Phasay was charged by amended information with intentional and felony murder in the second degree (counts I and II) for killing Bennett and with assault in the second degree of Thomas (count III). Phasay did not testify in his own behalf but called several members of his family to testify regarding Bennett's violent and aggressive disposition, particularly when he had been drinking.

Phasay's primary witness was April Gerlock, a psychiatric nurse practitioner who performs forensic analyses and who evaluated Phasay to determine if he had any mental health disorders that may have affected him on

the early morning of March 30, 2010. After reviewing records provided to her by defense counsel, and following her interview of Phasay, Gerlock concluded, as she explained to the jury, that Phasay suffered from posttraumatic stress disorder (PTSD) attributable to his experience as a young child fleeing Laos with his family during wartime. Gerlock opined that Phasay's PTSD caused him to react irrationally to the scene in the parking lot, causing him to believe his life was in danger.

On cross-examination, Gerlock acknowledged that her diagnosis was based entirely on Phasay's self-reporting, and that she had not contacted Phasay's family or friends to corroborate his claims or conducted any standard-use tests employed by mental health evaluators to determine if an individual is malingering.

The jury convicted Phasay on counts I and II, and acquitted him on count III. The court sentenced Phasay to 124 months in prison, one month more than the low point of the applicable standard range, plus a 60-month firearm enhancement, for a total of 184 months.[4] This appeal follows.[5]

II

Phasay first contends that the trial court erred and, thereby, violated his right to present a defense by prohibiting his brother, Mark Phasay, from testifying

---

[4] The trial court, recognizing that punishment could be imposed for only one of these counts, noted on the judgment and sentence that "counts I & II merge for purposes of sentencing."

[5] Following oral argument in this court, Phasay moved for permission to file a supplemental designation of the clerk's papers herein. He intended to designate the State's trial memorandum, to which a transcript of Phasay's police interrogation was attached. While we grant Phasay's motion, we note that, prior to oral argument, the panel had an opportunity to review a videotaped recording of the same interrogation, which had been timely designated (Ex. 64).

- 6 -

about an argument between Mark and Bennett that occurred approximately 24 hours before the shooting. The trial court's ruling was erroneous, Phasay asserts, because the testimony was admissible as res gestae evidence and to complete the picture of Bennett's character, which was material to Phasay's self-defense claim.[6] We disagree.

## A

The following additional facts are relevant to the resolution of this issue.

Mark is married to Melissa. On the evening of Sunday, March 28, 2010, Mark and Melissa argued, causing Melissa to leave their home. The occurrence of this argument was communicated to Bennett, who, sometime after midnight on March 29, stormed into Mark and Melissa's house without knocking. Bennett and Mark then engaged in a lengthy "yelling argument" about Melissa.[7] Bennett had been drinking before the argument commenced and continued to drink as it unfolded. Mark repeatedly demanded that Bennett leave but Bennett ignored him. Mark ended up leaving to pick up Melissa. When they returned, Bennett was driving away. It was approximately 2:00 a.m.

The defense sought to admit—and the State sought to exclude—trial testimony regarding the argument between Mark and Bennett. After considering

---

[6] Phasay appears to conflate these two, distinct bases for his claim of admissibility. At trial and again on appeal, Phasay argued that evidence of the argument between Mark and Bennett was admissible because it would complete the picture of the conflict between him and Bennett by describing Bennett's character to the fullest extent. Because different analyses apply to the admissibility of res gestae evidence and character evidence, we follow the approach of the trial court and address the apparent bases for Phasay's claim separately.

[7] In the course of this argument, Bennett allegedly threatened Mark by saying "bullets will fly."

extensive argument from both parties on the issue, the trial court made the

following detailed ruling:

> My ruling is that the altercation between [Bennett] and Mark Phasay does not fit within the res gestae meaning . . . . While time is not determinative, here it is somewhat relevant. Mark Phasay indicated in his Auburn police interview that the incident between him and [Bennett] occurred on Sunday, and in the Defense investigator notes he indicated it occurred two days prior to the shooting.[8]
>
> The incidents contained different individuals. The one with Mark Phasay included him and Melissa and [Bennett]. And then obviously the incident where the shooting occurred included the Defendant when [Thomas] was present.
>
> There were different precipitating events. Mark Phasay's treatment of Melissa was what precipitated the altercation between him and [Bennett]. And the belief that the Defendant was somehow involved in the home invasion incident is what appeared to precipitate the incident between the Defendant and [Bennett].
>
> Also, I don't find that the Defendant and his brother were targeted by [Bennett] for the same reasons or having anything to do with them being brothers. There was perhaps a mention of the incident with Mark Phasay by [Bennett], but it certainly wasn't a motivating factor and seemed to be only side information. I also don't find that it's relevant under 401 or 402. It really just goes to [Bennett]'s character, and it's not appropriate to be used in that way.
>
> Certainly the witnesses can be asked, and I don't think there's any disagreement regarding [Bennett]'s reputation for his violent disposition. Certainly the Defendant can testify, if he chooses to do so, with regard to all things known to him about [Bennett] and his relationship with [Bennett], the incidents between the two of them.

### B

A trial court has wide discretion in ruling on the admissibility of evidence.

A decision to admit or exclude evidence will not be reversed on appeal absent

abuse of discretion. State v. Demery, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001);

---

[8] In fact, the incidents occurred approximately 24 hours apart. The argument between Mark and Bennett occurred in the late evening/early morning of Sunday/Monday and the shooting occurred early Tuesday morning (after the home invasion late Monday evening).

accord State v. Pirtle, 127 Wn.2d 628, 648, 904 P.2d 245 (1995); State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995) (this court will not disturb a trial court's rulings on a motion in limine or the admissibility of evidence absent an abuse of the court's discretion); State v. Swan, 114 Wn.2d 613, 658, 790 P.2d 610 (1990) (the admission and exclusion of relevant evidence is within the sound discretion of the trial court and the court's decision will not be reversed absent a manifest abuse of discretion). A trial court abuses its discretion only if no reasonable judge would adopt the view espoused by the trial court. Demery, 144 Wn.2d at 758. Alleging that a ruling violated the defendant's right to present a defense does not alter the applicable standard of review.[9] State v. Franklin, 180 Wn.2d 371, 377 n.2, 325 P.3d 159 (2014) (reviewing a trial court's decision to exclude evidence for abuse of discretion, while considering whether an evidentiary ruling implicated constitutional rights to present a defense); accord State v. Dye, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013) ("Allegations that a ruling violated the defendant's right to a fair trial does not change the standard of review.").

C

Phasay first asserts that Mark's testimony was admissible as res gestae evidence.

---

[9] It does, of course, change the harmless error standard to be applied. Under the nonconstitutional harmless error standard an error in the admission of evidence is "'not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.'" State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997) (quoting State v. Tharp, 96 Wn.2d 591, 599, 637 P.2d 961 (1981)). Under the constitutional harmless error standard, an error of constitutional magnitude is harmless only if the State can prove beyond a reasonable doubt that the jury would have reached the same result in the absence of the error. Chapman v. California, 386 U.S. 18, 21-24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) (an error of constitutional magnitude cannot be deemed harmless unless it is "harmless beyond a reasonable doubt"); accord State v. Maupin, 128 Wn.2d 918, 928-29, 913 P.2d 808 (1996).

Testimony may be admissible as res gestae evidence "'if it is so connected in time, place, circumstances, or means employed that proof of such other misconduct is necessary for a complete description of the crime charged, or constitutes proof of the history of the crime charged.'" State v. Schaffer, 63 Wn. App. 761, 769, 822 P.2d 292 (1991) (quoting 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 115, at 398 (3d ed. 1989)), aff'd, 120 Wn.2d 616, 845 P.2d 281 (1993); accord State v. Lane, 125 Wn.2d 825, 831, 889 P.2d 929 (1995) (res gestae evidence "'complete[s] the story of the crime on trial by proving its immediate context of happenings near in time and place'" (quoting State v. Tharp, 27 Wn. App. 198, 204, 616 P.2d 693 (1980), aff'd, 96 Wn.2d 591, 637 P.2d 961 (1981))); State v. Brown, 132 Wn.2d 529, 571, 940 P.2d 546 (1997) (Evidence that "constitutes a 'link in the chain' of an unbroken sequence of events surrounding the charged offense, . . . is admissible [as res gestae evidence] 'in order that a complete picture be depicted for the jury.'" (quoting Tharp, 96 Wn.2d at 594)). The party seeking to introduce res gestae evidence has the burden of establishing that the evidence fits the definition, is relevant, and is not unfairly prejudicial.[10] State v. DeVincentis, 150 Wn.2d 11, 17, 74 P.3d 119 (2003); State v. Lough, 125 Wn.2d 847, 853, 889 P.2d 487 (1995); accord State v. Gresham, 173 Wn.2d 405, 421, 269 P.3d 207 (2012).

_____

[10] It is the subject of ongoing debate whether res gestae evidence should be analyzed as an exception to ER 404(b)'s prohibition against admitting evidence of other crimes, wrongs, or acts to prove the character of a person in order to show action in conformity therewith, or whether it is simply subject to the same relevance and prejudice limitations applicable to all evidence under ER 402 and ER 403. Compare, e.g., Lane, 125 Wn.2d at 831 (recognizing a "res gestae" or "same transaction" exception to ER 404(b)) with State v. Grier, 168 Wn. App. 635, 644, 278 P.3d 225 (2012) (rejecting the notion that res gestae evidence should be analyzed as an exception to ER 404(b)). The parties herein do not brief this point. Because we conclude that the evidence proffered herein as res gestae evidence was irrelevant, the debate is immaterial to our resolution. Thus, we need not further evaluate the issue.

Here, there was no reason to suppose that his stepdaughter's marital difficulties prompted Bennett to meet with Phasay on the night he was shot. As Thomas made clear, Bennett felt compelled to seek out Phasay due to his belief that Phasay had orchestrated the home-invasion robbery at Bennett's home hours earlier. The trial court's ruling recognized the significant differences between the identities of the actors in the two events and the absence of any carryover in motivating animus as well as the lapse in time between them.[11]

The trial court did not abuse its discretion by ruling that evidence of the argument between Mark and Bennett was not admissible as res gestae evidence.

## D

Phasay also asserts that Mark's testimony was admissible as character evidence relevant to his self-defense claim.

When a claim of self-defense is raised, the defendant may introduce two different kinds of evidence concerning the victim's character. 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE & LAW PRACTICE § 404.6, at 489-91 (5th ed. 2007).

First, the defendant may introduce evidence concerning the victim's reputation for violence. State v. Alexander, 52 Wn. App. 897, 900, 765 P.2d 321 (1988). "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular

---

[11] Because the trial court excluded evidence of Bennett's argument with Mark for a variety of reasons, not simply because of its remoteness in time from the shooting, Phasay's contention, based on Grier, 168 Wn. App. 635, that the argument was not too remote to be considered res gestae is of no moment.

occasion." ER 404(a). But "[e]vidence of a pertinent trait of character of the victim of the crime offered by an accused" is admissible. ER 404(a)(2). When a defendant asserts self-defense, evidence of the victim's violent disposition is a pertinent character trait and is relevant to the issue of whether the victim was the first aggressor. Alexander, 52 Wn. App. at 900.

Evidence offered for this purpose "must be in the form of reputation evidence, not evidence of specific acts." State v. Hutchinson, 135 Wn.2d 863, 886, 959 P.2d 1061 (1998). "Specific acts may be used to prove character only where the pertinent character trait is an essential element of a claim or defense," and "[s]pecific act character evidence relating to the victim's alleged propensity for violence is not an essential element of self-defense." Hutchinson, 135 Wn.2d at 886-87.

Second, evidence of the victim's violent actions or reputation may be admissible to show the defendant's state of mind at the time of the crime and to indicate whether he had reason to fear bodily harm. State v. Cloud, 7 Wn. App. 211, 218, 498 P.2d 907 (1972); accord State v. Adamo, 120 Wash. 268, 269, 207 P. 7 (1922). Thus, a defendant "'may, in addition to the character evidence, show *specific acts* of the [victim] which are not too remote and *of which [the defendant] had knowledge at the time of the [crime]* with which he is charged.'" Cloud, 7 Wn. App. at 218 (emphasis added) (quoting Adamo, 120 Wash. at 269); accord State v. Fondren, 41 Wn. App. 17, 25, 701 P.2d 810 (1985) ("Evidence of specific acts may be admissible for the limited purpose of showing whether the

- 12 -

defendant had a reasonable apprehension of danger.").[12]

Here, first, the proffered evidence was not admissible to show Bennett's alleged propensity for violence because the evidence concerned specific acts. Evidence of a victim's alleged propensity for violence "must be in the form of reputation evidence, not evidence of specific acts." Hutchinson, 135 Wn.2d at 886. Thus, while Phasay could introduce reputation evidence to establish a trait of Bennett's character, he could not introduce evidence of the argument between Mark and Bennett to accomplish this purpose.

Second, this evidence was not relevant to Phasay's state of mind, because Phasay failed to show that he knew of these acts at the time that he shot Bennett. In fact, it was uncontested that Phasay was estranged from his brother during the relevant period of time, was not present during the argument between his brother and Bennett, and was not aware of it on the night that he shot Bennett to death.

Therefore, the trial court did not abuse its discretion by ruling that the evidence of the argument between Mark and Bennett was not admissible

---

[12] Indeed, the Washington Supreme Court summarized these rules in 1922, stating: When a defendant seeks to excuse the killing on the ground of self-defense, it is competent for him to show the general reputation and character of the deceased for a quarrelsome disposition. The character of the deceased may be shown whether the defendant knew of it or not, because such testimony has a tendency to support the defendant's contention that the deceased was the aggressor. In proving the character of the deceased, specific acts of violence may not be shown. . . . However, where the person accused is defending, in whole or in part, on the ground that at the time of the homicide he believed, and had good reason to believe, that he was in danger of his life, or great bodily harm, he may, in addition to the character evidence, show specific acts of the deceased which are not too remote and of which he had knowledge at the time of the killing with which he is charged. *But such acts of the deceased may not be shown unless it appears they were brought to the knowledge of the defendant before he committed the crime charged.*
Adamo, 120 Wash. at 270-71 (emphasis added) (citation omitted).

character evidence.[13]

### III

Phasay next contends that the trial court erred by denying his request for a mistrial. He was entitled to a mistrial, Phasay asserts, because "the prosecutor kept the defense in the dark about the fact that Dr. Nordby would be presenting a new theory at trial." We disagree.

> In determining whether a trial court abused its discretion in denying a motion for mistrial, [appellate] court[s] will find abuse "only when no reasonable judge would have reached the same conclusion." [State v. Hopson, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989) (internal quotation marks omitted).] "The trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly. Only errors affecting the outcome of the trial will be deemed prejudicial." [Hopson, 113 Wn.2d at 284.] In determining the effect of an irregular occurrence during trial, we examine "(1) its seriousness; (2) whether it involved cumulative evidence; and (3) whether the trial court properly instructed the jury to disregard it." [Hopson, 113 Wn.2d at 284.]

State v. Johnson, 124 Wn.2d 57, 76, 873 P.2d 514 (1994).

In his motion for a mistrial, Phasay explained his claim thusly:

> During [the many months that the defense has worked closely with Dr. Nordby], Dr. Nordby has voiced the opinion that, based on the medical and other evidence, most likely if the defendant struck Tom Bennett with his hand or the butt of the Glock, it was before the fatal shots were fired at Mr. Bennett. The day before the parties delivered opening argument to the jury, Mr. Larson contacted Jon Nordby. After their conversation, Dr. Nordby decided that he can no longer say at what point the blow was struck to Mr. Bennett, that is, before or after the fatal shots. *Mr. Larson did not disclose this new information from Dr. Nordby to the defense as the State is*

---

[13] Phasay also contends that the trial court deprived him of his constitutional right to present a defense by excluding evidence of the argument between Mark and Bennett. While an accused is guaranteed the right to present a defense, U.S. CONST. amend. VI; WASH. CONST. art. I, § 22, this right is not absolute. For example, a defendant does not have a right to introduce evidence that is irrelevant or otherwise inadmissible. State v. Rehak, 67 Wn. App. 157, 162, 834 P.2d 651 (1992). Therefore, Phasay's constitutional claim also fails.

*required to do pursuant to due process and the Rules of Discovery.*[14]

(Emphasis added.)

In its response, the State denied that it had possessed any special knowledge of the results of Dr. Nordby's second analysis that had been withheld from defense counsel.

The trial court heard argument on Phasay's motion before Dr. Nordby was permitted to testify to the jury. The trial court observed that a mistrial would be warranted only if Phasay demonstrated that the prosecutor withheld from defense counsel the fact that Nordby intended to change his original findings. The parties were permitted to take testimony from Dr. Nordby in order to resolve this factual dispute.

Dr. Nordby testified that he had not given the prosecutor any advance notice of the results of his second analysis,[15] thus affirming the State's contention. Interestingly, he also testified that he had begun working on a reconsideration of his first opinion at the request of defense counsel,[16] contrary to defense counsel's asserted ignorance regarding the impending change.

---

[14] Phasay's only relevant legal citation was to <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[15] Q [prosecutor]    [During our telephone conversation that took place in the first week of November,] did we talk about the likelihood or any of what you might find in your second analysis?
A    No, certainly not.

[16] Q [defense counsel]  Okay. So you somehow decided that you were going to reconsider it after the prosecutor talked to you, what, two or three [ ] months later?
A    No, you asked me to reconsider it.
Q    I did?
A    Yes.
Q    Okay.

The trial court was presented no evidence of prosecutorial malfeasance. Therefore, the trial court's denial of Phasay's motion for mistrial was reasonable. There was no error.

## IV

Phasay next contends that the trial court erred by allowing Dr. Nordby to testify about his conclusions regarding the timing of Phasay's pistol-whipping of Bennett. Phasay asserts that Nordby's testimony in this regard was so speculative as to be of little use to the jury and was, therefore, prejudicial. We disagree.

The rule governing the admissibility of expert testimony is ER 702.[17] Once the trial court is satisfied with a witness's expertise, the test for admissibility is whether the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." ER 702; accord State v. Petrich, 101 Wn.2d 566, 575, 683 P.2d 173 (1984).

The determination of whether expert testimony is admissible is within the sound discretion of the trial court. State v. Stenson, 132 Wn.2d 668, 715, 940 P.2d 1239 (1997). "Moreover, the trial court's decision is given particular deference where there are fair arguments to be made both for and against admission. . . . '[I]f the reasons for admitting or excluding the opinion evidence are both fairly debatable, the trial court's exercise of discretion will *not* be reversed on appeal.'" Davidson v. Municipality of Metro. Seattle, 43 Wn. App.

---

[17] ER 702 (testimony by experts) provides:
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

569, 572, 719 P.2d 569 (1986) (citation omitted) (quoting Levea v. G.A. Gray Corp., 17 Wn. App. 214, 220-21, 562 P.2d 1276 (1977)).

Phasay did not object to Dr. Nordby's expert qualifications. Therefore, the only question for the trial court was whether the testimony would assist the jury in determining a fact at issue.

Although Dr. Nordby was unable to identify the precise time at which Phasay had struck Bennett's skull with the butt of his pistol, he was able to conclude by his comprehensive review of the evidence that the wound caused by the pistol-whipping happened peri-mortem, that is, at or near the time of death. Such a determination was likely beyond the abilities of the average lay juror to make on his or her own and bore significant relevance insofar as it related to the jury's task of deciding what transpired in the parking lot where Bennett was killed and whether Phasay acted out of reasonable fear or, instead, out of anger.[18]

The trial court did not abuse its discretion by admitting the expert testimony in question.

## V

Phasay next contends that the prosecutor engaged in misconduct by making certain arguments regarding the origin of Phasay's alleged PTSD symptoms. This is so, he asserts, because it is improper for a prosecutor to impugn the exercise of the right to counsel. His contention is unavailing.

To demonstrate that a prosecutor's comment denied a defendant a fair trial, the defendant must show that the conduct was both improper and

---

[18] The prosecutor's suggestion to the jury that the blunt-force injury was the product of post-shooting anger was simply a reasonable inference that he was entitled to advocate in his closing rebuttal.

prejudicial. <u>State v. Thorgerson</u>, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). Where a prosecutor's comments are improper and defense counsel objected at trial, the defendant must show a substantial likelihood that the comments prejudiced the jury's verdict. <u>State v. Emery</u>, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). If a defendant fails to object and to request a curative instruction at trial, the defendant waives his prosecutorial misconduct claim unless the comment "was so flagrant [and] ill intentioned that an instruction could not have cured the prejudice." <u>State v. Corbett</u>, 158 Wn. App. 576, 594, 242 P.3d 52 (2010).

Both the state and federal constitutions guarantee a criminal defendant the right to counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. "The State can take no action which will unnecessarily 'chill' or penalize the assertion of a constitutional right and the State may not draw adverse inferences from the exercise of a constitutional right." <u>State v. Rupe</u>, 101 Wn.2d 664, 705, 683 P.2d 571 (1984). But "not all arguments touching upon a defendant's constitutional rights are impermissible comments on the exercise of those rights." <u>State v. Gregory</u>, 158 Wn.2d 759, 806, 147 P.3d 1201 (2006) <u>overruled on other grounds by</u> <u>State v. W.R.</u>, 181 Wn.2d 757, 336 P.3d 1134 (2014). We look to whether the prosecutor "manifestly intended" the remarks to be a comment on a defendant's constitutional rights. <u>Gregory</u>, 158 Wn.2d at 806-07. Where the focus of a prosecutor's question is not on the right itself, the comment does not violate the defendant's constitutional right at issue. <u>Gregory</u>, 158 Wn.2d at 807.

We review a prosecutor's allegedly improper comment in the context of the entire argument, the issues in the case, the evidence the argument relied on,

and the jury instructions. State v. Russell, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994). When a prosecutor's comment implicates a constitutional right, we review under the constitutional harmless error standard, which requires that we reverse unless overwhelming evidence convinces us beyond a reasonable doubt of the defendant's guilt. State v. Moreno, 132 Wn. App. 663, 671-72, 132 P.3d 1137 (2006).

Herein, the prosecutor elicited from Phasay's psychological expert witness the fact that Phasay first began exhibiting symptoms of PTSD only after he learned that his attorneys wanted to have him evaluated by a forensic specialist. During his cross-examination of Dr. Gerlock, the prosecutor focused Dr. Gerlock's attention on notes from the jail's psychiatric staff about things Phasay told them on November 4, 2010. The state then had Dr. Gerlock read aloud some of Phasay's statements to the jail staff, including statements related to his meeting with his attorneys: "He says that he went to court yesterday and was told that his attorney will have a mental health professional from the outside come and talk with him. He discussed with his attorney some painful experiences he had as a child, include leaving Laos for a refugee camp in Thailand."

The prosecutor then asked Dr. Gerlock more questions about Phasay's meeting with his attorneys. The following exchange is illustrative:[19]

---

[19] A similar exchange occurred the following day. Moreover, the prosecutor advanced a similar argument in his closing argument. Phasay objected to this line of questioning/argument only once. Because we conclude that the argument was not improper, we need not disaggregate the analysis for each instance of alleged misconduct.

Q    . . . So on November 4, he comes back from court and he is told two things, right?  My lawyer is going to get a person to come and evaluate want [sic] me, right?
A    Yes.
Q    And that's you?  And it ends up being you, right?
A    It ends up being me.
Q    And the second thing that is related is that they then start engaging him in a conversation about his experiences in Laos, his childhood experiences from Laos?
A    Okay.  The question is?
Q    That's the second thing that you discussed with them on that date, correct?
A    Yes, that he discussed with the PES [(jail psychiatric)] staff or he related that to them.
Q    And isn't that when he started to make other complaints to PES then about memories and experiences from his childhood?  It was after he'd been to court, after he had talked to his lawyers, and after they had engaged him in a discussion about his childhood experiences?

. . . .

Q    . . . He starts to make more chronic complaints, though, about his experiences from Laos after that date, the 4th of November, and those are documented, aren't they?
A    In the medical record?
Q    Yeah.  The jail psychiatric records.
A    They do document more, yes.

Phasay objected to the prosecutor's questioning of Dr. Gerlock in this manner.  Following this objection, the prosecutor explained that he did not intend to suggest that Phasay's attorneys had somehow directed Phasay to malinger.  Rather, the prosecutor explained, his intention was to show that Phasay, after learning from his attorneys that they intended to have him submit to a forensic psychological evaluation, made a calculated decision on his own to pretend that he suffered from heretofore undiagnosed and un-exhibited PTSD.  The trial court accepted the prosecutor's explanation and noted that the prosecutor could properly explore the timing of Phasay's disclosures.  The court cautioned the prosecutor to avoid arguing to the jury that Phasay had been encouraged by his

attorneys to pretend to suffer from a mental disorder.

Thereafter, the prosecutor focused on the timeline of Phasay's disclosures of PTSD symptoms relative to his discovery that he would receive a psychological evaluation. In closing argument, for example, the prosecutor argued:

> It's entirely appropriate for a lawyer to say, where are you from? Well, maybe there's – that's something we should examine. But the question also becomes, does that plant some seed for Mr. Phasay? Well, it might or might not. You really want to look at what happened after that, wouldn't you? Sort of see whether or not that seed got planted in some fashion? Oh, we talked about my childhood in Laos. Ah, well, okay, I wonder if that's something that might be a part of what would be relevant for Dr. Gerlock.

In short, the prosecutor's theory was that Phasay feigned his PTSD symptoms. He supported his argument by highlighting the fact that Phasay began exhibiting and articulating PTSD symptoms only after he learned that he was going to be psychologically evaluated. What is important about defense counsel's statement is that Phasay heard it, attributed significance to it, and changed his behavior in response to it. It is not important, by contrast, that the statement that allegedly "planted a seed" was made by defense counsel. The prosecutor's theory had equal force regardless of who uttered the relevant statement, because it relied on drawing conclusions from Phasay's behavior after the relevant conversation took place.

Moreover, in arguing his theory, the prosecutor did not cast doubt upon the actions or statements of defense counsel. To the contrary, as quoted above, he described counsel's actions as "entirely appropriate for a lawyer." Furthermore, there was no implication from the prosecutor's argument that

Phasay had exercised his right to counsel for the purpose of receiving assistance in fabricating a defense. The prosecutor's theory was that defense counsel was the unwitting inspiration for Phasay's malingering, not his co-conspirator.

These facts distinguish this case from State v. Espey, 184 Wn. App. 360, 336 P.3d 1178 (2014), upon which Phasay relies to support his claim of impropriety. In Espey, the court found fault when the prosecutor expressly and repeatedly argued to the jurors, in closing, that they should assess the credibility of the defendant's postarrest statement to police with an eye to the fact that the defendant had consulted with two attorneys prior to his capture, and "had lots of time to figure out what story he was going to tell the police." 184 Wn. App. at 365. The unspoken implication in the prosecutor's remark was obvious: Espey had utilized his right to counsel in order to concoct a plausible defense.

Given the absence of any evidence that the prosecutor "manifestly intended" to comment on Phasay's right to counsel or suggested, even indirectly, that he had been coached by unethical counsel to feign a mental illness, we reject Phasay's claim of misconduct. [20, 21]

---

[20] Phasay also contends that the prosecutor "impugned defense counsel." Phasay cites three cases addressing this type of misconduct: State v. Warren, 165 Wn.2d 17, 29-30, 195 P.3d 940 (2008) (prosecutor told jury "mischaracterizations" in defense counsel's argument are "an example of . . . deal[ing] with defense attorneys," and described defense counsel's argument as a "classic example of taking these facts and completely twisting them[,] . . . hoping that you are not smart enough to figure out what . . . they are doing"); Thorgerson, 172 Wn.2d at 451-52 (prosecutor impugned defense counsel's integrity by referring to his presentation of his case as "bogus" and involving "sleight of hand"); and State v. Negrete, 72 Wn. App. 62, 67, 863 P.2d 137 (1993) (improper for prosecutor to state that "[defense counsel] is being paid to twist the words of the witnesses by [defendant]" (emphasis omitted)). There is no evidence herein of the type of misconduct identified in the cited cases.

[21] Phasay also claims that the trial court erred in admitting the same evidence. Because we conclude that the line of questioning/argument was not improper, there was no error in its admission.

VI

Phasay next contends that the trial court erred by admitting evidence that suggested that Phasay had a duty to retreat. Again, this claim is unavailing.

In Washington, a person has no duty to retreat when he is assaulted in a place where he has a right to be. State v. Redmond, 150 Wn.2d 489, 493, 78 P.3d 1001 (2003); State v. Hiatt, 187 Wash. 226, 237, 60 P.2d 71 (1936); State v. Lewis, 6 Wn. App. 38, 40, 491 P.2d 1062 (1971). Where the facts are such that a jury might be able to conclude that retreat was "a reasonably effective alternative to the use of force," the jury must be told that the accused had no duty to retreat instead of using force. Redmond, 150 Wn.2d at 495.

That is precisely what occurred in this case. Shortly after he was arrested, Phasay participated in an extended videotaped interrogation with detectives. Ex. 64. During this interrogation, the detectives asked Phasay why he did not walk or run away following the initial fracas with Bennett, after which Bennett got into his vehicle and prepared to leave.

Phasay requested that evidence of the interrogation be redacted to remove this line of questioning because, he asserted, it improperly suggested to the jury that he had a duty to retreat. The trial court ruled that it was admissible without the requested redactions. However, as required, the trial court also specifically instructed the jury that a person has a legal right to stand his ground

and has no duty to retreat. Jury Instruction 31. Therefore, there was no trial court error.[22]

VII

Finally, Phasay contends that he was denied the effective assistance of counsel. This is so, he asserts, because "[d]efense counsel repeatedly failed to object to improper evidence and argument that was presented to the jury." Phasay's claim fails.

To prevail on a claim of ineffective assistance of counsel a defendant must demonstrate that: (1) counsel's representation was deficient, meaning it fell below an objective standard of reasonableness based on consideration of all of the circumstances; and (2) the defendant was prejudiced, meaning there is a reasonable probability that the result of the proceeding would have been different but for the challenged conduct. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If we decide that either prong has not been met, we need not address the other prong. State v. Garcia, 57 Wn. App. 927, 932, 791 P.2d 244 (1990).

Phasay makes two specific claims of deficiency. The first is related to the admission of Ex. 99, which contained the notes from jail psychiatric staff that

---

[22] Phasay also argues that the prosecutor engaged in misconduct by arguing that Phasay had a duty to retreat.

"'As a quasi-judicial officer representing the people of the State, a prosecutor has a duty to act impartially in the interest only of justice.' The prosecutor may not misstate the law to the jury." State v. Swanson, 181 Wn. App. 953, 958-59, 327 P.3d 67 (quoting Warren, 165 Wn.2d at 27), review denied, 339 P.3d 635 (2014).

Herein, the prosecutor did not argue that Phasay had a duty to retreat. To the contrary, in his closing remarks he correctly observed that Washington law does not require a person to run away from a threat but, instead, allows the person to resist with appropriate force.

indicated that Phasay had been made aware that he would be psychologically evaluated. Though Phasay acknowledges that defense counsel objected to the admission of this evidence, he asserts that the objection was made when "it was too late." However, Phasay fails to explain how, within reasonable probabilities, the alleged untimeliness of this objection affected the result of his trial. Specifically, he does not establish that an objection interposed earlier would have been granted. Similarly, he does not explain how such a ruling would have altered the trial's result.

Second, Phasay asserts that defense counsel "failed to act in a timely manner" in advancing the argument regarding the res gestae value of the proffered evidence that Bennett had been in a fight with Mark the night before the shooting. However, once again, Phasay fails to explain how the timing of the argument on this matter prejudiced him. Moreover, the record indicates that the trial court considered defense counsel's supplemental argument regarding the relevance of this evidence and declined to change its ruling.

Because Phasay fails to establish that he was prejudiced by either of the asserted examples of defense counsel's alleged deficiency, his claim of ineffective assistance fails.

Affirmed.

We concur: