IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80947-4-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| JORGE NAVA MARTINEZ JR., | ) | |
| DOB: 08/09/1986, | ) | |
| | ) | |
| Appellant. | ) | |

BOWMAN, J. — Jorge Nava Martinez Jr. appeals his jury conviction for one count of first degree murder with a firearm enhancement. Nava Martinez Jr. alleges the State improperly minimized its burden during jury selection, the trial court erred in denying his motions for a mistrial after witnesses twice violated a pretrial order, the prosecutor committed misconduct by vouching for two witnesses, the trial court erred in admitting certain evidence and violated his constitutional right to confrontation, and the cumulative effect of these errors deprived him of a fair trial. He also asserts the trial court erred in calculating his offender score and inadvertently imposed a DNA[1] collection fee. We affirm Nava Martinez Jr.'s conviction, but reverse his sentence and remand for resentencing and for the trial court to strike the DNA fee.

---

[1] Deoxyribonucleic acid.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

On February 19, 2018, Tye Burley won around $2,000 at a casino. He used some of the money to rent a hotel room in Marysville that he shared with his friend and drug supplier Jeremy Dailey. Dailey saw Burley win the "jackpot" of money that night and began scheming ways to get his hands on it. He thought about taking Burley's wallet while he slept but did not want to be the obvious suspect.

On February 20, Burley left the hotel with his girlfriend Kristin Schram. Dailey knew Burley planned to buy Schram a tattoo that day. Dailey met with two friends, Jared Evans and Nava Martinez Jr.[2] Dailey told Evans and Nava Martinez Jr. about Burley's casino winnings.[3] Evans did not know Burley very well but he "didn't like him." He was angry that Burley did not pay back some money he believed Burley owed him. Later, Jose Nava joined them. Nava Martinez Jr. is Nava's older brother. Neither Nava Martinez Jr. nor Nava knew Burley.

According to Dailey, the men drove around in a white Dodge Durango owned by Nava's girlfriend Tiffany Beston while they formulated a plan to rob Burley at the tattoo shop. They planned to mace Burley as he left the shop and steal his wallet. Nava Martinez Jr. said that if Burley " 'does anything dumb, I'll shoot him.' " Nava Martinez Jr. told the group he planned to get a "cuete."[4]

The four men aborted their original plan after seeing a police car drive by the tattoo shop. They decided to confront Burley back at his hotel instead. They drove to

---

[2] Dailey also regularly sold drugs to Evans. He said that he never sold drugs to Nava Martinez Jr. but they did drugs together.

[3] Dailey thought Bailey had as much as $7,000 in cash winnings.

[4] "Cuete" can be slang for "gun" in Spanish.

2

the hotel, sat in the Durango smoking methamphetamine, and waited for Burley to arrive. Dailey and Evans testified that Nava Martinez Jr. was driving and Nava was in the front passenger seat.

Burley and Schram arrived at the hotel at around 7:00 p.m. and began walking to Burley's room. Nava and Nava Martinez Jr. got out of the Durango and confronted them. They wore face coverings and hooded sweatshirts. One of the two pointed a gun at Schram. She remembered "seeing the hole of the gun" and that it was silver, and she had the impression that it was a handgun with "a pretty long barrel." Schram screamed and ran away. Nava Martinez Jr. and Nava then beat Burley to the ground and robbed him. At some point, Nava Martinez Jr. shot Burley once in the back of the head. Burley died from the wound two days later.

The brothers ran back to the Durango. Nava Martinez Jr. got in the driver's seat first, holding a silver handgun and yelling, " 'I shot him in the head.' " Nava got in the front passenger side a few moments later, crying Nava Martinez Jr.'s name and holding Burley's wallet. They fled the scene and abandoned the Durango. The four spilt the money from Burley's wallet between them.

Marysville police arrived and interviewed Schram. She told them that she suspected Dailey was involved in the attack. Detectives found Schram's wallet and a can of bear mace at the scene. The next day, police interviewed Dailey and Evans. Everett police officers found the abandoned Durango about a week later. Police never found Burley's wallet or the gun used to shoot him.

A Washington State Patrol Crime Laboratory (WSPCL) forensic scientist found Nava's DNA on the gearshift of the Durango and "excluded" Dailey, Evans, and Nava

3

Martinez Jr. "as the source" of the DNA. A WSPCL forensic scientist also traced Nava Martinez Jr.'s DNA to the steering wheel and the handle pulls and controls of the driver's side interior door of the Durango and excluded Dailey, Evans, and Nava as the source of the DNA. Surgeons recovered part of a bullet from Burley's head. Testing by a WSPCL ballistics expert showed the bullet was fired from a .38 caliber handgun.[5]

Nava Martinez Jr. and Nava fled to California. On February 28, 2018, members of the Escondido Police Department arrested them and managed to identify Nava Martinez Jr. using facial recognition software. They discovered an active warrant from Washington. Marysville police detectives interviewed Nava in California. In his statement to police, Nava admitted that on February 20, 2018, he "wanted to . . . get high" and drove around Marysville in Beston's Durango with Dailey and Evans to get drugs. "[B]ut they were short of money" so the three planned to wait outside a tattoo shop to rob someone. Nava also told detectives that he was not the driver and that they ended up at the hotel where Burley was shot because the robbery did not " 'work out.' " According to Nava, they sat in the car and smoked heroin, Dailey and Evans put on a "sweater or something," and exited the Durango. Then he heard a "bang or something." Nava never said that Nava Martinez Jr. was with them.

The State charged Dailey, Evans, Nava Martinez Jr., and Nava with first degree murder with firearm enhancements. Dailey and Evans later agreed to plead guilty to reduced charges in exchange for "truthful" testimony against Nava Martinez Jr. and Nava. At their joint trial, Nava Martinez Jr. testified but Nava did not.

---

[5] Detectives later learned that Nava's girlfriend Beston owned a black and silver .38 caliber Beretta and kept it in a lockbox at her home. When detectives asked to see her gun, she discovered it was "missing." Beston testified that she and Nava lived together and the last time she saw the gun was about a week before the murder.

The jury convicted Nava Martinez Jr. of first degree murder and found that he was armed with a firearm when he committed the crime. Using an offender score of 4, the court imposed a sentence of 434 months, the high end of the standard range. The court also ordered Nava Martinez Jr. to pay a $100 DNA collection fee. It otherwise found Nava Martinez Jr. indigent and waived all discretionary legal financial obligations. Nava Martinez Jr. appeals.

ANALYSIS

Nava Martinez Jr. alleges the State improperly minimized its burden during jury selection, the trial court erred in denying his motions for a mistrial after witnesses twice violated a pretrial order, the prosecutor committed misconduct by vouching for two witnesses, and the trial court erred in admitting certain evidence and violated his right to confrontation. He argues that the cumulative effect of these errors denied him a fair trial. He also argues the court erred in calculating his offender score and improperly imposed the DNA fee. We address each argument in turn.

Jury Selection

Nava Martinez Jr. contends the State improperly minimized its burden during jury selection by "repeatedly press[ing] jurors about finding a person guilty based on accomplice liability and ask[ing] them to declare the circumstances under which they would convict a person as an accomplice." We disagree.

"The limits and extent of voir dire examination are within the discretion of the trial court, and it has considerable latitude." State v. Robinson, 75 Wn.2d 230, 231, 450 P.2d 180 (1969). "[A]bsent an abuse of discretion and a showing that the rights of an accused have been substantially prejudiced, a trial court's ruling on the scope and

5

content of voir dire will not be disturbed on appeal." State v. Davis, 141 Wn.2d 798, 826, 10 P.3d 977 (2000).

Jury selection is meant to "enable the parties to learn the state of mind of the prospective jurors, so that they can know whether or not any of them may be subject to a challenge for cause, and determine the advisability of interposing their peremptory challenges." State v. Tharp, 42 Wn.2d 494, 499-500, 256 P.2d 482 (1953). But a party should not use jury selection to educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law. State v. Frederiksen, 40 Wn. App. 749, 752, 700 P.2d 369 (1985). Asking general hypothetical questions without implicating the unique facts of the case does not commit potential jurors to a verdict. See Green v. Johnson, 160 F.3d 1029, 1036-37 (5th Cir. 1998).

Here, the State introduced the concept of accomplice liability by posing a hypothetical question about driving a friend to the bank. The hypothetical involved the jurors assuming the role of the driver and increasingly suspicious behavior by the "friend," including putting on a ski mask, pulling out a gun before entering the bank, and returning from the bank "holding a sack of something." At each stage, the prosecutor asked jurors whether they believed they had "done anything wrong" by failing to intervene. The prosecutor asked one juror, "Does it matter to you when you knew what was going on." The prosecutor did not instruct the jurors on the legal definition of accomplice liability or use particular facts of Nava Martinez Jr.'s case, and he did not use the hypothetical to argue the State's case. Rather, the prosecutor explored the

concept of accomplice liability in general to learn the jurors' state of mind. The prosecutor's hypothetical did not minimize the State's burden or otherwise exceed the proper scope of jury selection.

Motions for Mistrial

Nava Martinez Jr. argues the trial court should have granted his motions for a mistrial because the State twice violated a pretrial order prohibiting it from offering evidence that Nava Martinez Jr. "had been in prison before." We disagree.

Because the trial court is in the best position to determine whether a trial irregularity caused prejudice, we review a trial court's decision to deny a motion for mistrial for an abuse of discretion. State v. Stenson, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997); State v. Jackson, 150 Wn.2d 251, 276, 76 P.3d 217 (2003). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds. State v. Allen, 159 Wn.2d 1, 10, 147 P.3d 581 (2006). The court should grant a mistrial "only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly." State v. Mak, 105 Wn.2d 692, 701, 718 P.2d 407 (1986).

In determining whether a trial irregularity is so prejudicial as to require a mistrial, we look to (1) the seriousness of the irregularity, (2) whether the irregularity was cumulative of other admissible evidence, and (3) whether the court could cure the irregularity by an instruction to disregard the remark. State v. Weber, 99 Wn.2d 158, 165-66, 659 P.2d 1102 (1983). Ultimately, we will reverse the trial court only if there is a substantial likelihood the irregularity affected the jury's verdict. State v. Rodriguez, 146 Wn.2d 260, 269-70, 45 P.3d 541 (2002).

In his interview with the police, Dailey said that "he first met Mr. [Nava] Martinez [Jr.] in prison." Before trial, the prosecutor agreed that "[w]e will not seek to admit that fact. We will simply talk about their connections outside of jail." At trial, the prosecutor and Dailey had the following exchange:

Q. Do you know Jorge [Nava] Martinez [Jr.]?
A. Yes.
Q. Do you know when it was that you met him?
A. In prison last time. 2014.

The defense objected to the answer and the court instructed the jurors to disregard the testimony. The defense then moved for a mistrial, which the court denied.

Later, Officer Sean Davidson testified about arresting Nava Martinez Jr. and Nava in Escondido, California. Officer Davidson explained that he was able to identify Nava Martinez Jr. through facial recognition software on his cell phone that can identify people "as long as the person has been in jail in San Diego County." The defense did not object to this testimony but later renewed its motion for a mistrial, which the court again denied.

Citing State v. Escalona, 49 Wn. App. 251, 742 P.2d 190 (1987), Nava Martinez Jr. argues that "[i]mproper references" to Nava Martinez Jr.'s "prior prison sentence and jail term suggested he—and Nava by association—were criminal types, likely to commit the robbery that resulted in Burley's death." In that case, the State charged Escalona with second degree assault for threatening the victim with a knife. Escalona, 49 Wn. App. at 252. At trial, the victim testified that Escalona " 'already has a record and had stabbed someone.' " Escalona, 49 Wn. App. at 253. We held this testimony was prejudicial propensity evidence because a jury could conclude that Escalona "acted on

this occasion in conformity with the assaultive character he demonstrated in the past." Escalona, 49 Wn. App. at 255-56.

Unlike Escalona, no witness here testified that Nava Martinez Jr. was in custody for a similar crime. As for Dailey's comment about meeting Nava Martinez Jr. some years earlier in prison, the trial court properly instructed the jury to disregard the testimony. We presume jurors follow a trial court's instructions. State v. Johnson, 124 Wn.2d 57, 77, 873 P.2d 514 (1994). And as to Officer Davidson's explanation of the facial recognition software, the testimony was fleeting and indirect. Nava Martinez Jr. fails to show that the testimony was so prejudicial as to require a mistrial.

Prosecutorial Misconduct

Nava Martinez Jr. argues that the prosecutor "improperly vouched" for its two key witnesses by eliciting evidence in its case-in-chief of their formal agreements to testify truthfully. The State claims Dailey and Evans' testimony was proper to "rehabilitate" them. We agree with the State.

We review allegations of prosecutorial misconduct for an abuse of discretion. Stenson, 132 Wn.2d at 718. The defendant bears the burden of proving that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial. State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). We determine whether the defendant was prejudiced under one of two standards of review. State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). If the defendant objected at trial, the defendant must show that the prosecutor's misconduct led to prejudice that had a substantial likelihood of affecting the jury's verdict. State v. Anderson, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009) (citing State v. Reed, 102

Wn.2d 140, 145, 684 P.2d 699 (1984)). If the defendant did not object at trial, we deem the defendant to have waived any error unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. Stenson, 132 Wn.2d at 726-27.

Whether a witness has testified truthfully "is entirely for the jury to determine." State v. Ish, 170 Wn.2d 189, 196, 241 P.3d 389 (2010) (citing United States v. Brooks, 508 F.3d 1205, 1210 (9th Cir. 2007)). Improper vouching generally occurs if the prosecutor (1) expresses his or her personal belief as to the veracity of the witness or (2) suggests that evidence not presented at trial supports the witness' testimony. Ish, 170 Wn.2d at 196.

"[E]vidence that a witness has agreed to testify truthfully generally has little probative value and should not be admitted as part of the State's case in chief." Ish, 170 Wn.2d at 198. But where the defense attacks the witness' credibility, the State is within its rights to "rehabilitate" its witness by introducing the details of a plea agreement that requires truthful testimony. See State v. Petrich, 101 Wn.2d 566, 574, 683 P.2d 173 (1984), abrogated on other grounds by State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988). And it is reasonable for the State to "anticipate the attack and 'pull the sting' of the defense's cross-examination." State v. Bourgeois, 133 Wn.2d 389, 402, 945 P.2d 1120 (1997) (quoting United States v. LeFevour, 798 F.2d 977, 983 (7th Cir. 1986)).

Here, both Nava Martinez Jr. and Nava attacked Dailey and Evans' credibility in opening remarks. And before Dailey testified, Nava Martinez Jr. made clear that he intended to examine Dailey about "why he entered this agreement, what his motives

were, and how they're explained by his prior conduct in being a liar and a cheat and a schemer. Because that goes to his credibility, and it goes to his state of mind." Nava agreed that "Dailey has been given a very good deal in order to — in exchange for his testimony here, and it's important that we get to explore all of those issues and let the jury decide what's important and what's not." As a result, it was reasonable for the prosecutor to elicit testimony about the witnesses' agreements to testify truthfully during questioning on direct to "pull the sting" out of the defense attack on their credibility during cross-examination. LeFevour, 798 F.2d at 983. The prosecutor did not commit misconduct.

<u>Evidentiary Errors</u>

Nava Martinez Jr. claims the trial court erred by admitting testimony (1) that he had "access to a gun without evidence of its connection to the crime" and (2) that "unknown people" coerced Dailey to make statements exonerating Nava Martinez Jr. and Nava. We disagree.

### Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. State v. Ashley, 186 Wn.2d 32, 38-39, 375 P.3d 673 (2016). An abuse of discretion occurs when the trial court bases its decision on untenable grounds or reasons. State v. Darden, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002).

Admissible evidence must be relevant. ER 402; State v. Scherf, 192 Wn.2d 350, 386-87, 429 P.3d 776 (2018). Evidence is relevant if it has a logical nexus to the fact to be established. State v. Burkins, 94 Wn. App. 677, 692, 973 P.2d 15 (1999); see ER 401. "The threshold to admit relevant evidence is very low. Even minimally relevant

evidence is admissible." State v. Darden, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002). But even relevant evidence is not admissible if the danger of unfair prejudice substantially outweighs its probative value. ER 403; State v. Briejer, 172 Wn. App. 209, 226, 289 P.3d 698 (2012). Evidence is unfairly prejudicial if it is likely to elicit an emotional response from the jury rather than a rational decision. State v. Powell, 126 Wn.2d 244, 264, 893 P.2d 615 (1995). Unfair prejudice is caused by evidence of " 'scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.' " Carson v. Fine, 123 Wn.2d 206, 223, 867 P.2d 610 (1994)[6] (quoting United States v. Roark, 753 F.2d 991, 994 (11th Cir. 1985)).

Firearm Evidence

Nava Martinez Jr. contends testimony that he and Nava had access to Beston's firearm was unduly prejudicial because there was not adequate evidence that it was connected to the crime. He is incorrect.

We have routinely excluded as unfairly prejudicial evidence of weapons having "no relation to" or " 'nothing to do with the crime charged.' " State v. Freeburg, 105 Wn. App. 492, 501 n.22, 501, 20 P.3d 984 (2001) (citing Moody v. United States, 376 F.2d 525, 532 (9th Cir. 1967)) (quoting United States v. Warledo, 557 F.2d 721, 725 (10th Cir. 1977)). When the State tries to sway the jury into believing a defendant is a "bad man" or inherently dangerous because he owns or possesses weapons, the trial court should exercise its discretion to exclude such evidence. See Moody, 376 F.2d at 532; State v. Rupe, 101 Wn.2d 664, 705, 683 P.2d 571 (1984).

---

[6] Internal quotation marks omitted.

Nava Martinez Jr. cites Freeburg to support his position that admitting evidence of access to Beston's firearm unfairly prejudiced him. In that case, officers arrested Freeburg more than two years after he committed murder. Freeburg, 105 Wn. App. at 495-96. At trial, the State introduced evidence that Freeburg was carrying a handgun when officers arrested him. Freeburg, 105 Wn. App. at 496. The State agreed that Freeburg did not use the weapon in the underlying crime and instead argued that possession of the gun evidenced flight and consciousness of guilt. Freeburg, 105 Wn. App. at 500, 497. We concluded the trial court erred by admitting the evidence because it was unrelated to the murder:

> [T]he gun was not the gun used in the shooting of Rodriguez, the arrest occurred more than two years after the shooting, and the presence of the gun does not by itself indicate a consciousness of the serious offense [Freeburg] faced.

Freeburg, 105 Wn. App. at 500.

In contrast, the State elicited testimony that Beston's gun could have been the firearm used to kill Burley. Beston testified that she owned a small, .38 caliber, black and silver Beretta handgun during the time that she and Nava lived together. She discovered the gun was missing after the murder. The WSPCL determined a .38 caliber bullet killed Burley. Schram testified that the gun used during the robbery was a silver handgun with a long barrel. And Dailey testified that Nava Martinez Jr. was holding a small "silver or chrome" handgun when he returned to the Durango after Burley was shot. The jury could conclude from this evidence that the shooter used Beston's gun to kill Burley. As a result, Nava Martinez Jr.'s access to the gun was probative as to who killed Burley.

Nava Martinez Jr. argues this evidence was unduly prejudicial because there was also testimony tending to show that the gun had no connection to Burley's murder. For example, Schram testified that the gun pointed at her during the robbery had a long barrel, while the barrel of Beston's Beretta was short. And the WSPCL ballistics expert said that in her opinion, "it's not probable" that Beston's gun matched the fired bullet jacket recovered from Burley. But the expert also testified that she could not "conclusively eliminate" the Beretta. That there was competing evidence on whether the shooter used Beston's gun to kill Burley does not render the testimony inadmissible. It is the province of the trier of fact to weigh evidence and judge the credibility of witnesses. See State v. Carver, 113 Wn.2d 591, 604, 781 P.2d 1308, 789 P.2d 306 (1989). The jury was free to weigh the competing evidence and consider inferences in reaching its verdict. The trial court did not abuse its discretion by admitting evidence that Nava had access to Beston's gun.

Threats to Dailey

Nava Martinez Jr. asserts the trial court erred in admitting evidence that "some unnamed person told Mr. Dailey to contact Mr. [Nava] Martinez [Jr.]'s mother and tell her [he] was not involved in the shooting." According to Nava Martinez Jr., the evidence was improper because there "was no evidence connecting this threat to Mr. [Nava] Martinez [Jr.] and no corroboration that any such threat ever occurred."

Before trial, Nava Martinez Jr. and Nava notified the State that they intended to introduce a recording of a telephone call Dailey made from jail to Nava Martinez Jr. and Nava's mother. In the call to their mom, Dailey explained that Nava Martinez Jr. and Nava did not kill Burley. As a result, the State introduced the recording in its case-in-

14

chief. Nava Martinez Jr. and Nava did not object. The State then elicited testimony from Dailey that he was "getting beat up" in jail and that someone claiming to be Nava Martinez Jr.'s friend told Dailey that if he made the call to Nava Martinez Jr. and Nava's mother, "they'd stop sending people to beat me up." After he made the call, the beatings stopped.

Citing Bourgeois, Nava Martinez Jr. argues the "prosecution may not use allegations that someone other than the accused may have threatened a witness to bolster its case when there is no proven connection between the accused and the threat." But Bourgeois, which involved two owners of a market getting shot, addressed testimony from the surviving victim and bystanders who generally were "reluctant to appear in court" or "afraid to testify." Bourgeois, 133 Wn.2d at 393.[7] Our Supreme Court concluded that the testimony about the witnesses' state of mind was not relevant because "no connection was established between Bourgeois and the reluctance of any witness to testify." Bourgeois, 133 Wn.2d at 400.

Here, the evidence that Nava Martinez Jr.'s friends coerced Dailey was relevant to rebut the inference that Dailey willingly exonerated Nava Martinez Jr. and Nava when he called their mother. Because the defense chose to use Dailey's telephone call as evidence that Nava Martinez Jr. and Nava did not shoot Burley, the State could introduce the rebuttal evidence. Unlike Bourgeois, the relevance of the evidence does not turn on whether the threats came from Nava Martinez Jr. and Nava. Evidence that

---

[7] One woman who did not witness the crime testified that she was afraid to testify because the defendant offered her money to lie about his whereabouts during the incident and a friend of the defendant threatened her. Bourgeois, 133 Wn.2d at 395.

someone coerced Dailey to make the call was relevant to Dailey's state of mind, no matter who threatened him. The trial court did not err in admitting the evidence.

Confrontation Violation

Nava Martinez Jr. argues the prosecutor improperly urged the jury to convict him based on statements Nava made to the police. Nava Martinez Jr. contends using Nava's statements violated his right to confrontation because he could not cross-examine Nava.

We review de novo alleged violations of a criminal defendant's constitutional right to confront adverse witnesses, including a nontestifying codefendant's post-arrest confession. U.S. CONST. amend VI; WASH. CONST. art. I, § 22; State v. Larry, 108 Wn. App. 894, 901-02, 34 P.3d 241 (2001), review denied, 146 Wn.2d 1022, 52 P.3d 521 (2002).

The Sixth Amendment's confrontation clause guarantees criminal defendants the right to confront their accusers. This includes the right to cross-examine witnesses. Richardson v. Marsh, 481 U.S. 200, 206, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987). Generally, where two defendants are tried jointly, the pretrial confession of a defendant who does not testify cannot be admitted against the other. Richardson, 481 U.S. at 206. This is because the nontestifying codefendant essentially becomes one of the defendant's accusers, but is protected from cross-examination by his Fifth Amendment right not to testify. Bruton v. United States, 391 U.S. 123, 134, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968); U.S. CONST. amend. V; see Richardson, 481 U.S. at 200. But a trial court can admit a nontestifying codefendant's confession if it redacts all reference to the

16

other defendant so that the statement is not "incriminating on its face." Richardson, 481 U.S. at 208-09.

Here, Marysville detectives flew to California and interviewed Nava. At trial, the prosecutor redacted Nava's statement to the detectives so that it did not incriminate Nava Martinez Jr. on its face. And the State purposefully asked "leading" questions of the detective when eliciting testimony about Nava's statement to avoid improper references to Nava Martinez Jr. Still, citing Richardson, 481 U.S. at 211, Nava Martinez Jr. argues that the State violated his right to confrontation by encouraging the jury to "use Mr. Nava's testimonial statement" to impeach Nava Martinez Jr.'s testimony. In Richardson, the United States Supreme Court held it was not error to admit a redacted codefendant confession that only became incriminating to the defendant when linked with other evidence (such as the defendant's testimony). Richardson, 481 U.S. at 211. But it is error for the prosecutor to seek to "undo the effect of [a] limiting instruction" that the jury may not consider a statement of one defendant as evidence against another "by urging the jury to use [the nontestifying defendant's] confession in evaluating" the other defendant's case. Richardson, 481 U.S. at 211, 205 n.2.

Here, the record does not support Nava Martinez Jr.'s claim that the prosecutor urged the jury to use Nava's statement to police to impeach him. In closing, the prosecutor used a Microsoft PowerPoint slide to show the jury Nava's statements while he talked about portions of Nava's confession that video evidence corroborated. The prosecutor then used a separate slide to summarize admissions made by Nava Martinez Jr. during his testimony. The prosecutor did not contrast Nava's statements against Nava Martinez Jr.'s testimony or encourage the jury to use Nava's statements

as evidence to convict Nava Martinez Jr.[8]  Nava Martinez Jr. fails to show that the State violated his right to confrontation.

Cumulative Error

Nava Martinez Jr. asserts that cumulative error entitles him to a new trial. Cumulative error "is limited to instances where there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial."  State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000); State v. Hodges, 118 Wn. App. 668, 673-74, 77 P.3d 375 (2003).  As discussed above, Nava Martinez Jr. establishes no trial error.  The cumulative error doctrine does not apply.

Offender Score

Nava Martinez Jr. assigns error to his offender score, arguing that the State failed to show that one of his juvenile convictions did not "wash out."[9]  The State acknowledges that it did not present certified copies of judgment and sentences supporting Nava Martinez Jr.'s multiple misdemeanor convictions that would prevent the conviction from washing out.  But it argues that "a sworn summary of information in government databases" presented to the court is "adequate to establish the defendant's criminal history."[10]  We disagree.

---

[8] As much as the prosecutor's actions could be conceived as doing so, the judge instructed the jury, "You may consider a statement made out of court by one defendant as evidence against that defendant, but not as evidence against another defendant."  We presume jurors follow a trial court's instructions.  State v. Johnson, 124 Wn.2d 57, 77, 873 P.2d 514 (1994).

[9] Nava Martinez Jr. also argues the State produced insufficient proof to support two other juvenile convictions, but the record shows the trial court did not rely on those convictions to calculate his offender score.

[10] The State also claims Nava Martinez Jr. waived any error by failing to object below.  A defendant may challenge his offender score for the first time on appeal unless he affirmatively agrees with the calculation of his offender score.  See State v. Nitsch, 100 Wn. App. 512, 518-19, 997 P.2d 1000 (2000).  Here, the State does not allege that Nava Martinez Jr. affirmatively agreed to the offender score.

"We review a sentencing court's calculation of an offender score de novo." State v. Tili, 148 Wn.2d 350, 358, 60 P.3d 1192 (2003). But the existence of a prior conviction is a question of fact, which we review for sufficient evidence. In re Pers. Restraint of Adolph, 170 Wn.2d 556, 566, 243 P.3d 540 (2010).

In calculating an offender score, the sentencing court must (1) identify all prior convictions, (2) eliminate those that wash out, and (3) count the prior convictions that remain. State v. Moeurn, 170 Wn.2d 169, 175, 240 P.3d 1158 (2010). The State has the burden of proving a defendant's criminal history by a preponderance of the evidence. State v. Mendoza, 165 Wn.2d 913, 920, 205 P.3d 113 (2009). This includes proving misdemeanor convictions that prevent other convictions from washing out. State v. Cross, 156 Wn. App. 568, 586-87, 234 P.3d 288 (2010). The best evidence of a prior conviction is a certified copy of the judgment and sentence, but the State may introduce comparable documents of records or transcripts of prior proceedings to establish a defendant's criminal history. State v. Hunley, 175 Wn.2d 901, 910, 287 P.3d 584 (2012).

" '[A] sentence that is based upon an incorrect offender score is a fundamental defect that inherently results in a miscarriage of justice.' " State v. Wilson, 170 Wn.2d 682, 688-89, 244 P.3d 950 (2010)[11] (quoting In re Pers. Restraint of Goodwin, 146 Wn.2d 861, 868, 50 P.3d 618 (2002)). The proper remedy in such cases is reversal and remand for resentencing. State v. Ramirez, 190 Wn. App. 731, 734-35, 359 P.3d 929 (2015).

---

[11] Alteration in original.

19

At sentencing, the trial court relied on Nava Martinez Jr.'s 2001 conviction for second degree malicious mischief as one criminal conviction contributing to his offender score of 4. Second degree malicious mischief is a class C felony. RCW 9A.48.080(2). Class C felony convictions other than sex offenses are not included in the offender score if, since the last date of release from confinement or entry of judgment and sentence, the offender spends five consecutive years in the community without committing any crime resulting in a conviction. RCW 9.94A.525(1)(c). The trial court listed Nava Martinez Jr.'s "[p]rior convictions constituting criminal history for purposes of calculating the offender score" in his judgment and sentence. The list includes no convictions between the 2001 malicious mischief and a 2013 assault.

The State acknowledges that it did not offer certified records, dockets, or transcripts showing that a court convicted Nava Martinez Jr. of a criminal offense within five years of his release from confinement or entry of judgment and sentence after his 2001 malicious mischief conviction. But it argues that any error is harmless because it attached to its presentence memorandum a document entitled "Prosecutor's Understanding of Defendant's Criminal History" that listed 15 "Adult Misdemeanors" between 2003 and 2016 for which Nava Martinez Jr. had been convicted. And a paralegal from the Snohomish County Prosecuting Attorney's Office certified the document by signing the following affidavit:

> I am a paralegal employed by the Snohomish County Prosecutor's Office, and make this affidavit in that capacity. I have reviewed the following databases maintained by federal and state agencies to determine the above named defendant's criminal history: NCIC[12] (maintained by the FBI[13]), WWCIC (Washington State Patrol Criminal History Section), JIS

---

[12] National Crime Information Center.

[13] Federal Bureau of Investigation.

20

(Judicial Information System). I may have reviewed the following databases or other sources, including but not limited to: DOL (Washington State Department of Licensing) and DOC (Washington State Department of Corrections). A review of those sources indicates the defendant's criminal history is as listed above.

I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

In State v. Cate, 194 Wn.2d 909, 912-13, 453 P.3d 990 (2019), the State summarized the defendant's criminal history "based on a review of plea agreements and criminal databases" as evidence of prior convictions to calculate the defendant's offender score. Division Three held the summary amounted to sufficient evidence to meet the State's burden. Cate, 194 Wn.2d at 913. But our Supreme Court reversed, stating that "[i]t is irrelevant that the prosecutor summarized criminal history since such a summary does not satisfy the State's burden of proof." Cate, 194 Wn.2d at 913. We fail to see how offering a "sworn summary" of a defendant's criminal history based on a review of criminal databases differs in any meaningful way from offering an uncertified summary. Neither satisfies the State's burden of proof. We reverse Nava Martinez Jr.'s sentence and remand for resentencing.

DNA Fee

Nava Martinez Jr. contends the DNA collection fee "was improperly imposed and should be stricken" because the "sentencing documents presented to the court" show that a prior court ordered him to submit his DNA and pay the collection fee following a 2013 felony conviction. The State argues that the record is insufficient for us to consider the issue because it does not show that the state actually collected Nava Martinez Jr.'s DNA in 2013. We agree with Nava Martinez Jr.

Every sentence for a felony "must include a fee of one hundred dollars unless the state has previously collected the offender's DNA as a result of a prior conviction." RCW 43.43.7541. The statute "makes the DNA fee discretionary if the defendant's DNA has been collected because of a prior conviction; it does not require that the defendant provide proof that the laboratory has his DNA sample." State v. Anderson, 9 Wn. App. 2d 430, 461, 447 P.3d 176 (2019). Nava Martinez Jr. showed that a court convicted him of a prior felony, ordered collection of his DNA, and required him to pay a collection fee. As a result, assessing the collection fee was discretionary. The court determined Nava Martinez Jr. was indigent and waived discretionary legal final obligations. See State v. Ramirez, 191 Wn.2d 732, 748, 426 P.3d 714 (2018) (prohibiting the imposition of discretionary legal financial obligations on indigent defendants). We remand for the trial court to strike the DNA fee upon resentencing.

We affirm Nava Martinez Jr.'s conviction, reverse his sentence, and remand to the trial court for resentencing consistent with this opinion.

_____, J.

WE CONCUR:

_____          _____